ACCEPTED
15-25-00023-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
4/14/2025 3:41 PM
CHRISTOPHER A. PRINE
CLERK

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
4/14/2025 3:41:30 PM
CHRISTOPHER A. PRINE
Clerk

# In the Court of Appeals
# for the Fifteenth Judicial District
# Austin, Texas

STATE OF TEXAS,

*Appellant,*

*v.*

NONPARTY PATIENT NO. 1, NONPARTY PATIENT NO. 2, NONPARTY PATIENT NO. 3, NONPARTY PATIENT NO. 4, NONPARTY PATIENT NO. 5, NONPARTY PATIENT NO. 6, NONPARTY PATIENT NO. 7, AND NONPARTY PATIENT NO. 8, NONPARTY PATIENT NO. 9, NONPARTY PATIENT NO. 10, AND NONPARTY PATIENT NO. 11,

*Appellees.*

On Appeal from the 95th Judicial District Court, Dallas County

## BRIEF FOR APPELLANT

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

AUSTIN KINGHORN
Deputy Attorney General for
Civil Litigation

JOHNATHAN STONE
Chief, Consumer Protection Division

ABIGAIL E. SMITH
Assistant Attorney General
State Bar No. 24141756

ROB FARQUHARSON
Assistant Attorney General
State Bar No. 24100550

Office of the Attorney General
Consumer Protection Division
12221 Merit Drive, Ste. 650
Dallas, Texas 75251
Tel: (214) 290-8830
Fax: (214) 969-7615

*Counsel for Appellant*

ORAL ARGUMENT REQUESTED

# IDENTITY OF PARTIES AND COUNSEL

**Appellant:**
State of Texas

**Appellate and Trial Counsel for Appellant:**

ABIGAIL E. SMITH
Assistant Attorney General
State Bar No. 24141756
Abby.Smith@oag.texas.gov
ROB FARQUHARSON
Assistant Attorney General
State Bar No. 24100550
Rob.Farquharson@oag.texas.gov

JOHNATHAN STONE
Division Chief, Consumer Protection
Division
State Bar No. 24071779
Johnathan.Stone@oag.texas.gov
DAVID SHATTO
Assistant Attorney General
State Bar No. 24104114
David.shatto@oag.texas.gov

Office of the Attorney General of
Texas
Consumer Protection Division
12221 Merit Drive, Ste. 650
Dallas, Texas 75251

Office of the Attorney General of
Texas
Consumer Protection Division
P.O. Box 12548 (MC-010)
Austin, Texas 78711

**Appellees:**
Non-party Patients 1–11

**Appellate and Trial Counsel for Appellee:**

Jervonne D. Newsome
Texas Bar No. 24094869
jnewsome@winston.com
Thanh D. Nguyen
State Bar No. 24126931
tdnguyen@winston.com
Jonathan Hung
State Bar No. 24143033
johung@winston.com

William M. Logan
Texas Bar No. 24106214
wlogan@winston.com
Evan D. Lewis
edlewis@winston.com
State Bar No. 24116670
Olivia A. Wogon
Texas Bar No. 24137299
owogon@winston.com

WINSTON & STRAWN LLP
2121 N. Pearl St., 9th Floor
Dallas, TX 75201
Telephone: (214) 453-6500

WINSTON & STRAWN LLP
800 Capitol Street, Suite 2400
Houston, TX 77002
Telephone: (713) 651-2600

# TABLE OF CONTENTS

Page(s)

Identity of Parties and Counsel ................................................................. ii

Index of Authorities ................................................................................ vi

Record References ................................................................................. viii

Statement of the Case ........................................................................... viii

Statement of Jurisdiction ....................................................................... viii

Issues Presented ..................................................................................... ix

Introduction ............................................................................................. 1

Statement of Facts .................................................................................... 2

    I.   The State Sues Dr. Lau for Violating SB 14, the Ban on
        Transgender Treatments for Minors, in Collin County. ........................... 2

    II.  The State Serves Subpoenas on Hospitals; Non-party Patients
        Sue in Dallas County. ........................................................................ 3

    III. Procedural History .......................................................................... 4

    IV. Other Related Proceedings ............................................................... 4

Summary of the Argument ........................................................................ 5

Standard of Review ................................................................................... 5

Argument ................................................................................................. 6

    I.   The State is Protected from this Suit by Sovereign Immunity. ................... 6

        A.  Sovereign immunity protects the State from suit, absent
              express waiver by the legislature or the State. ................................. 6

        B.  Sovereign immunity applies to State-brought lawsuits for civil
              penalties. .................................................................................... 8

        C.  Sovereign immunity applies to this action. .................................... 9

        D.  Neither Tex. R. Civ. P. 176.6 nor 192.6 affirmatively waive
              sovereign immunity. .................................................................... 11

    II.  Non-party Patients Lack Standing to Challenge the Subpoena for
        the 10 Unrepresented Patients. ......................................................... 13

Prayer .................................................................................................... 15

Certificate of Compliance ........................................................................ 15

Appellant's Appendix .......................................................................16

# Index of Authorities

**Page(s)**

**Cases**

*Allibone v. Freshour,*
2017 WL 5663607 (Tex. App. Nov. 21, 2017) ...................................................13

*Bd. of Land Comm'rs v. Walling,*
Dallam 524 (Tex. 1843) ...................................................................... 6

*Brown & Gay Eng'g, Inc. v. Olivares,*
461 S.W.3d 117 (Tex. 2015) ................................................................ 6

*DaimlerChrysler Corp. v. Inman,*
252 S.W.3d 299 (Tex. 2008) .......................................................... 5, 13, 14

*Dallas Area Rapid Transit v. Whitley,*
104 S.W.3d 540 (Tex. 2003) ................................................................ 7

*Hosner v. DeYoung,*
1 Tex. 764 (Tex. 1847) ...................................................................... 7

*In re Google LLC,*
2025 WL 258715 (Tex. App.—15th Dist., Jan. 16, 2025, pet.
imminent) ............................................................................... 12, 13

*Nazari v. State,*
561 S.W.3d 495 (Tex. 2018) ..........................................................*passim*

*Reata Constr. Corp. v. City of Dall.,*
197 S.W.3d 371 (Tex. 2006) ..........................................................*passim*

*State v. Brannan,*
111 S.W.2d 347 (Tex. Civ. App.—Waco 1937, writ ref'd). ................................ 7

*Tex. Adjutant Gen.'s Office v. Ngakoue,*
408 S.W.3d 350 (Tex. 2013) ................................................................ 6

*Tex. Dep't of Parks & Wildlife v. Miranda,*
133 S.W.3d 217 (Tex. 2004) ................................................................ 5

*Tex. Educ. Agency v. Leeper*,
893 S.W.2d 432 (Tex. 1994) ................................................................ 12

*Tex. Off. of Comptroller of Pub. Accts. v. Saito*,
372 S.W.3d 311 (Tex. App. 2012) ............................................ 1, 7, 11

*Wichita Falls State Hosp. v. Taylor*,
106 S.W.3d 692 (Tex. 2003) .................................................. 7, 11, 12

**Statutes**

Tex. Gov't Code § 311.034 .......................................................... 1, 7, 11

Tex. Gov't Code § 554.0035 ................................................................. 7

Tex. Health & Safety Code § 481.071 ................................................. 3

**Other Authorities**

Tex. R. Civ. P. 176.6 ............................................................... *passim*

Tex. R. Civ. P. 192.6 ............................................................... *passim*

Tex. R. Civ. P. 199.4 ........................................................................ 12

## RECORD REFERENCES

"CR" refers to the one-volume clerk's record. "RR" refers to the one-volume reporter's record of March 6, 2025.

## STATEMENT OF THE CASE

| | |
|---|---|
| *Nature of the Case*: | This is a subpoena challenge seeking to quash the production of medical records under Tex. R. Civ. P. 176.6 and 192.6. |
| *Trial Court*: | 95th District Court, Dallas County<br>The Honorable Monica Purdy |
| *Course of Proceedings*: | After Non-party Patients 1–11 filed suit seeking to quash the State's subpoenas, the State filed a plea to the jurisdiction and plea in abatement. |
| *Disposition in the Trial Court*: | The district court rendered an order denying the State's plea to the jurisdiction and plea in abatement. CR.401. After the State automatically stayed the proceedings by appealing the denial of its plea to the jurisdiction, the district court proceeded to issue an order staying all document production. CR.402. |

## STATEMENT OF JURISDICTION

The Court has jurisdiction under Texas Civil Practice and Remedies Code Section 51.014(a)(8) and Texas Government Code Section 22.220(d)(1).

# Issues Presented

The issues presented are as follows:

1.  Did the trial court err in denying the State's plea to the jurisdiction based on sovereign immunity?

2.  Did Non-party Patients have standing to challenge production of medical records for 10 patients they do not represent?

# Introduction

In Texas, it is black-letter law that the State is immune from suit unless the legislature waives sovereign immunity using "clear and unambiguous statutory language." *Texas Off. of Comptroller of Pub. Accts. v. Saito*, 372 S.W.3d 311, 313 (Tex. App. 2012); Tex. Gov't Code § 311.034. It is also black-letter law that while sovereign immunity does not apply to certain "offset" claims filed in response to a governmental entity's affirmative lawsuit for monetary damages, sovereign immunity most certainly *does* apply to a governmental entity's affirmative lawsuit for *civil penalties*. *Compare Reata Constr. Corp. v. City of Dall.*, 197 S.W.3d 371, 375 (Tex. 2006), *with Nazari v. State*, 561 S.W.3d 495, 507 (Tex. 2018).

Those two simple concepts are enough to decide this case. After the State sued a pediatrician in Collin County for violating several Texas laws, including the state ban on providing cross-sex hormone treatments to minors, the State issued subpoenas to two hospitals for the medical records of 21 relevant patients. Eleven of those patients retained counsel and filed suit in Dallas County, seeking to quash the subpoenas for *all twenty-one* patients in their entirety.

But the State is protected from such suit by sovereign immunity. The State has never sued Non-party Patients 1–11, so there is no lawsuit for them to "offset" under the *Reata* rule; furthermore, even if the State had, the State's lawsuit against the doctor was for civil penalties, not monetary damages. The State is thus subject to sovereign immunity, and the two Texas Rules of Civil Procedure that Non-party Patients rely on—Rules 176.6 and 192.6—contain no "clear and unambiguous" waiver of that sovereign immunity. Even to the extent sovereign immunity does not apply,

1

Non-party Patients 1–11 have no standing to challenge production for the other 10 unrepresented patients.

This should have been an easy case for a plea to the jurisdiction—and it still is. This Court should reverse the trial court and remand with instructions to dismiss the case for lack of subject-matter jurisdiction.

## STATEMENT OF FACTS

Many related proceedings and motions concerning the facts of this case are currently before this Court. To ease the Court's understanding, the below chart displays all ongoing litigations related to this matter and major relevant case events:



## I. The State Sues Dr. Lau for Violating SB 14, the Ban on Transgender Treatments for Minors, in Collin County.

On October 17, 2024, after an investigation, the State sued Dr. May C. Lau for violations of the Texas Deceptive Trade Practices Act and SB 14, the statewide ban on providing cross-sex hormones, puberty blockers, and so-called gender-affirming

surgeries to 21 minors.[1] The State filed its Original Petition and Request for Injunctive Relief in the 493rd Judicial District Court of Collin County. CR.43. On November 4, 2024, the State filed a similar lawsuit against a different doctor, Dr. M. Brett Cooper, also with the 493rd Judicial District Court of Collin County. On January 13, 2025, the court entered a protective order to ensure privacy of the minor patients involved and their medical records. CR.79.

## II. The State Serves Subpoenas on Hospitals; Non-party Patients Sue in Dallas County.

On January 16, 2025, the State served subpoenas on Children's Hospital Dallas (Children's) and UT Southwestern Medical Center (UTSW) (collectively "the hospitals") for the medical records of 21 patients treated by Dr. Lau. CR.22, CR.31.[2] The State concurrently mailed notice to all 21 patients at their most recent address known to the State, informing them of the subpoenas.[3]

On February 2, 2025, 11 of the 21 patients (Non-party Patients) obtained representation and filed this lawsuit in Dallas County challenging the subpoenas for medical records for all 21 patients.CR.11. They have also filed several non-party motions

---

[1] The State has since amended its Original Petition to add a cause of action for violating Texas Health & Safety Code § 481.071, which prohibits the prescription of controlled substances without a valid medical purpose.

[2] The State later withdrew and served substantially similar subpoenas on both hospitals.

[3] As with prior filings before this Court, the State has not attached such notices to safeguard the identities of the minor patients but can provide them to the Court on request in a supplementary filing.

in the Collin County action seeking to stay virtually all discovery in that case, despite not being parties to that action and declining to intervene. *See* Case. No. 15-25-00031-CV (Non-party Patients' Mandamus filing to this Court challenging the Collin County Court's production orders).

## III. Procedural History

On March 3, 2025, the State filed a plea to the jurisdiction and plea in abatement in this case, arguing sovereign immunity and dominant jurisdiction. CR.340. On March 6, 2025, the Dallas County Court held a hearing. The court first denied the State's plea to the jurisdiction and plea in abatement. CR.401. The State immediately filed its notice of appeal to this Court, automatically staying proceedings in Dallas County. CR.426. Ignoring this stay, the Dallas County Court proceeded to issue an order staying the hospitals from producing "*any* documents to the State until the interlocutory appeal [of the denial of the State's plea to the jurisdiction] reaches a final resolution." CR.402 (emphasis in original). This appeal concerns the State's plea to the jurisdiction; the State separately filed a mandamus petition challenging the denial of its plea in abatement and the improperly issued order. *See* Case No. 15-25-00039-CV.

## IV. Other Related Proceedings

While the Dallas County case was proceeding and since this appeal has been filed, the Collin County Court has continued to oversee discovery in its own case, including ordering the hospitals to produce medical records for all 21 patients to either their counsel (in the case of Non-party Patients 1–11) or to Dr. Lau (in the case

of the unrepresented patients) for privilege and redaction review. Non-party Patients have filed a mandamus petition with this Court seeking review of that order. *See* Case No. 15-25-00031-CV.

## Summary of the Argument

**I.** The State is protected from this subpoena challenge by sovereign immunity because Non-party Patients chose to file this challenge as a new lawsuit in a new jurisdiction, rather than as a motion in the existing lawsuit. Because the State's lawsuit against Dr. Lau is a suit for civil penalties, not monetary damages, the State did not open itself up to "offset" claims from Dr. Lau or third parties. *See Reata Constr. Corp. v. City of Dall.*, 197 S.W.3d 371, 375 (Tex. 2006); *Nazari v. State*, 561 S.W.3d 495, 507 (Tex. 2018). And since neither of the rules that form the basis of this subpoena challenge contain an affirmative waiver of sovereign immunity, *see* Tex. R. Civ. P. 176.6, 192.6, sovereign immunity applies.

**II.** Even to the extent sovereign immunity does not apply, Non-party Patients 1–11 do not represent the other 10 patients subject to the 21-patient subpoena. As such, they do not have standing to challenge the production of those 10 patients' records. *DaimlerChrysler Corp. v. Inman*, 252 S.W.3d 299, 304 (Tex. 2008).

## Standard of Review

"Whether a court has subject matter jurisdiction is a question of law." *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004).

5

# ARGUMENT

## I. The State is Protected from this Suit by Sovereign Immunity.

Sovereign immunity protects the State from countersuit or related claims when it files an affirmative suit for civil penalties. Because the relevant Texas Rules of Civil Procedure do not contain an affirmative waiver of sovereign immunity, the State is immune from this suit.

### A. Sovereign immunity protects the State from suit, absent express waiver by the legislature or the State.

The doctrine of sovereign immunity "bars suit against the state and its entities" unless the state waives immunity. *Tex. Adjutant Gen.'s Office v. Ngakoue*, 408 S.W.3d 350, 353 (Tex. 2013) (citation omitted). Sovereign immunity protects the State and its political subdivisions from endless litigation, while leaving to the Legislature to determine how and "when to allow tax resources to be shifted 'away from their intended purposes toward defending lawsuits and paying judgments.'" *Brown & Gay Eng'g, Inc. v. Olivares*, 461 S.W.3d 117, 121 (Tex. 2015) (quoting *Tex. Nat. Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 853–54 (Tex. 2002) (plurality op.)). Sovereign immunity is a common-law creation, and "it remains the judiciary's responsibility to define the boundaries of the . . . doctrine and to determine under what circumstances sovereign immunity exists in the first instance." *Reata Constr. Corp. v. City of Dall.*, 197 S.W.3d 371, 375 (Tex. 2006). By contrast, the Legislature determines when and to what extent to waive that immunity. *Id.* The doctrine of sovereign immunity has been part of Texas jurisprudence since the days of the Republic. *See Bd. of Land Comm'rs v. Walling*, Dallam 524, 526 (Tex. 1843) (discussing the

6

doctrine in the courts of the Republic); *Hosner v. DeYoung*, 1 Tex. 764, 769 (Tex. 1847) (recognizing the doctrine after Texas joined the Union). The doctrine has generally been considered "a rule of necessity." *State v. Brannan*, 111 S.W.2d 347, 348 (Tex. Civ. App.—Waco 1937, writ ref'd).

A finding of legislative wavier of sovereign immunity "requires clear and unambiguous statutory language." *Texas Off. of Comptroller of Pub. Accts. v. Saito*, 372 S.W.3d 311, 313 (Tex. App. 2012); Tex. Gov't Code § 311.034. For a plaintiff to overcome a defendant's assertion of sovereign immunity, "the plaintiff must affirmatively demonstrate the court's jurisdiction by alleging a valid waiver of immunity." *Whitley*, 104 S.W.3d at 542. *Dallas Area Rapid Transit v. Whitley*, 104 S.W.3d 540 (Tex. 2003). This waiver must be truly express—for example, the Supreme Court has approvingly cited statutory language stating "Sovereign immunity is waived and abolished to the extent of liability for the relief allowed under this chapter for a violation of this chapter," as being sufficiently "clear and unambiguous." *Wichita Falls State Hosp. v. Taylor*, 106 S.W.3d 692, 696 n.5 (Tex. 2003), judgment withdrawn and reissued (May 13, 2003) (quoting Tex. Gov't Code § 554.0035).

In addition to legislative waiver, certain types of claims against the government fall outside the scope of sovereign immunity to begin with, so waiver is not required. One such category is affirmative claims filed by a governmental entity for damages. In the case *Reata Construction Corporation v. City of Dallas*, the Supreme Court observed that if a "governmental entity interjects itself into or choose to engage in litigation to assert affirmative claims for monetary damages, the entity will presumably have made a decision to expend resources to pay litigation costs." 197 S.W.3d at 375.

7

Thus, because the government has already made the decision to expend tax resources on the litigation, the traditional rationale for sovereign immunity does not apply to the extent the opposing party files counterclaims "only as an offset to reduce the government's recovery." *Id.* The Court further held that in cases filed by the government "for monetary relief," sovereign immunity does not protect the government from "claims germane to, connected with, and properly defensive to those asserted by the governmental entity." *Id.* at 377. This is known as the *Reata* rule.

In sum, in Texas suits against a government entity, sovereign immunity is the default: It applies and the State is immune from suit, unless the Legislature expressly waived it or the case falls outside the scope of sovereign immunity, like State-brought affirmative claims for monetary damages.

## B. Sovereign immunity applies to State-brought lawsuits for civil penalties.

The Supreme Court has made clear that the *Reata* rule applies *only to affirmative government claims for damages*—it does *not* apply to State suits for civil penalties. In *Nazari v. State*, 561 S.W.3d 495 (Tex. 2018), the State brought Texas Medicaid Fraud Prevent Act claims seeking penalties against dental providers for fraudulently obtaining Medicaid payments for dental and orthodontic treatments to children. 561 SW.3d at 495. The providers responded with counterclaims and third-party claims against the State. *Id.* The provider argued that the State had abrogated sovereign immunity by filing suit against them and that they could now sue the State in response because it was "subject to the same rules that govern other parties," like the

Texas Rules of Civil Procedure, and that the State "must participate in the litigation process as an ordinary litigant." *Id.* at 501 (citing cases).

The trial court, Third Court of Appeals, and Supreme Court all rejected the providers' argument. *Id.* The Supreme Court held that "the *Reata* rule . . . *never* applies when the state initiates litigation to enforce a substantive prohibition against unlawful conduct by imposing a monetary penalty." *Id.* at 507 (emphasis added). This is because "offsets," like those in *Reata*, are "never 'germane to, connected with, and properly defensive to' whether a monetary penalty is due. Penalties are inherently one-sided. Citizens cannot claim a penalty against the state, but the state can and does frequently assess fines, penalties, and sanctions against its citizens." *Id.* The Court further held that "applying the *Reata* rule to [suits by the State seeking civil] penalties would run counter to *Reata* itself and would thwart the primary justifications underlying sovereign immunity's very existence . . . ." *Id.* at 509.

## C. Sovereign immunity applies to this action.

Because the State's lawsuit against Dr. Lau in Collin County sought only civil penalties and injunctive relief, not monetary damages, the *Reata* rule does not apply and the case does not fall outside the scope of sovereign immunity. As an initial matter, Non-party Patients' argument that the State waived sovereign immunity[4] to *their* lawsuit in Dallas County by suing *Dr. Lau* in Collin County would not hold water even if the State's suit were for money damages. That is because the State has never

---

[4] While the Non-party Patients refer to the State as having "waived" sovereign immunity under *Reata*, technically *Reata* is based "not on a waiver theory, but on the *scope* of the [government's] immunity." *Nazari*, 561 S.W.3d at 501.

sued the Non-party Patients. Thus, any permissible offset claims under *Reata* could be filed only by Dr. Lau, not by the Non-party Patients.

But regardless, sovereign immunity protects the State from counterclaims and third-party claims brought by *any* party because the State's suit against Dr. Lau seeks civil penalties, not monetary damages. CR.75 ¶¶ 257–58 (State's Original Petition, Prayer for Relief). This is the exact situation addressed by the Supreme Court in *Nazari*. A lawsuit against the State cannot be an "offset" for monetary damages when the State seeks no damages from Non-party Patients (or Dr. Lau) to begin with. "Since the state's action is punitive rather than compensatory, . . . the *Reata* rule does not apply." *Nazari*, 561 S.W.3d at 510.

Importantly, this does not leave Non-party Patients without a remedy. Had Non-party Patients chosen to file their subpoena challenge in Collin County (which is permitted under Texas Rules of Civil Procedure 176.6(e) and 192.6, the bases for this action), it would have been in the form of a motion related to a discovery issue in the State's case and on the State's claims. Sovereign immunity would not apply. Indeed, Non-party Patients *have* brought various challenges to the subpoenas in Collin County Court, and that court has devoted substantial time to resolving those challenges. *See* Case No. 15-25-00031-CV (mandamus petition filed with this Court regarding the Non-party Patients' discovery challenges in Collin County).

But because Non-party Patients chose to file this challenge in a separate court in Dallas County, they changed the form of their challenge from a discovery motion in an ongoing case to a new lawsuit bring a third-party claim. This is the exact form of suit prohibited in *Nazari*. It is barred by sovereign immunity.

10

**D. Neither Tex. R. Civ. P. 176.6 nor 192.6 affirmatively waive sovereign immunity.**

Finally, neither of the Texas Rules of Civil Procedure at issue contain "clear and unambiguous language" waiving sovereign immunity for subpoena challenges. *Saito*, 372 S.W.3d at 313; Tex. Gov't Code § 311.034. The Supreme Court has held that for a statute to waive sovereign immunity, it must usually state so expressly, such as by saying "sovereign immunity to suit is waived." *Wichita Falls*, 106 S.W.3d at 697. There is no such clear waiver language here—indeed, neither Rule 176.6 nor Rule 192.6 makes any reference to sovereign immunity. And while the State is ordinarily subject to the Texas Rules of Civil Procedure when it litigates, those rules are not sufficient to overcome sovereign immunity when it has not been waived. *See Nazari*, 561 S.W.3d at 500–01 (holding that while "procedural rules apply to the state just as they would any other litigant," those rules are not sufficient to waive sovereign immunity).

On the "rare occasions" that the Supreme Court has found "waiver of sovereign immunity absent 'magic words,'" the Court has considered four factors. *Id.* The first factor is whether the statute would be "meaningless unless immunity were waived." *Id.* Second, if the statute has any "ambiguities" concerning immunity, they should be resolved in favor of retaining immunity. *Id.* Third, "if the Legislature requires that the State be joined in a lawsuit for which immunity would otherwise attach, the Legislature has intentionally waived the State's sovereign immunity." *Id.* at 697–98. And fourth, waiver is more likely when the Legislature has enacted "simultaneous measures to insulate public resources from the reach of judgment

creditors," such as a statutory provision that limits "the State's potential liability." *Id.* at 698.

None of those four factors are present here. *First*, far from being meaningless, Rules 176.6 and 192.6 still function in 99.9% of cases that do not involve challenges to government subpoenas issued in a civil penalty case. They still function in this case as well, albeit in a limited manner—Non-party Patients are still able to challenge the subpoenas in Collin County. *Second*, there is no ambiguity about the lack of waiver—but to the extent it exists, it must be resolved in favor of retaining immunity for the State. *Third*, there is no Legislative requirement that the State join a lawsuit that waives immunity. The primary example of this is the Declaratory Judgments Act, which "expressly provides that persons may challenge ordinances or statutes, and that governmental entities must be joined or notified." *Tex. Educ. Agency v. Leeper*, 893 S.W.2d 432, 446 (Tex. 1994). But neither Rule at issue in this case says anything about mandatory joinder or notification. *Finally*, neither Rule says anything about limiting the State's liability. In sum, neither Rule 176.6 nor 192.6 expressly or implicitly waives sovereign immunity, so the State is immune from this suit.

Below, Non-party Patients additionally cited this Court's recent holding in *In re Google LLC*, 2025 WL 258715 (Tex. App.—15th Dist., Jan. 16, 2025, pet. imminent), to support their position of affirmative waiver. But that case has no bearing on this one. As this Court is aware, in *Google*, the State brought Deceptive Trade Practices Act and Capture or Use of Biometric Identifier Act claims against Google. *Id.* at *1. Google noticed a party representative deposition for the State seeking a representative of the State on several topics pursuant to Tex. R. Civ. P. 199.4. This Court held

12

that sovereign immunity is abrogated as to *party depositions* in suits brought by the State. *Id.* at \*7. *Google* says absolutely nothing about whether the State filing one lawsuit abrogates immunity against the filing of new lawsuits by nonparties in a different jurisdiction.

The State files thousands of lawsuits every year—yet Non-party Patients can point to no statute nor any case law showing that the State waives sovereign immunity from suits brought under Rules 176.6 and 192.6. In the lone instance of waiver that undersigned counsel are aware of, *Allibone v. Freshour*, the Texas Medical Board *affirmatively chose to waive sovereign immunity* in a suit brought under Tex. R. Civ. P. 176.6 and 192.6. 2017 WL 5663607, at \*2 n.4 (Tex. App.–Austin Nov. 21, 2017). *Allibone* is distinguishable because it involved an administrative subpoena, not a court-issued subpoena from an ongoing litigation. But it is also an exception that proves the rule—there is no general waiver of sovereign immunity by the State from suit brought under Rules 176.6 and 192.6. The State is decidedly *not* waiving sovereign immunity in this suit; consequently, the Dallas County Court should have dismissed this suit for lack of jurisdiction.

## II. Non-party Patients Lack Standing to Challenge the Subpoena for the 10 Unrepresented Patients.

Even if this case were not blocked by sovereign immunity, Non-party Patients do not have standing to challenge the subpoenas insofar as they apply to the production of medical records for patients they do not represent, because Non-party Patients suffer no injury from that production. "A court has no jurisdiction over a claim made by a plaintiff without standing to assert it." *DaimlerChrysler Corp. v. Inman*,

252 S.W.3d 299, 304 (Tex. 2008). "For standing, a plaintiff must be personally aggrieved . . . ." *Id.*

The subpoenas challenged by Non-party Patients seek medical records for 21 patients of Dr. Lau. CR.27–28 (Children's subpoena); CR.36–37 (UTSW subpoena). But as the caption of this case indicates, Non-party Patients 1–11 represent only eleven of those patients. They therefore do not have standing to challenge productions of medical records related to the 10 unrepresented patients unless those productions would somehow cause them an injury that is "concrete and particularized, actual or imminent, not hypothetical." *Inman*, 252 S.W.3d at 304. Non-party Patients have never presented any evidence in this case that the production of records for unrelated, unrepresented patients would harm them. And to the extent they have argued harm in other cases, the record is clear that those claims of injury are baseless. *See, e.g.*, State's Resp. to Mandamus Pet'n, Case No. 15-25-00031-CV.

## Prayer

The Court should reverse the district court's denial of the State's plea to the jurisdiction and direct the district court to dismiss the case for lack of subject-matter jurisdiction.

Respectfully Submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

AUSTIN KINGHORN
Deputy Attorney General for
Civil Litigation

JOHNATHAN STONE
Chief, Consumer Protection Division

*/s/ Abigail E. Smith*
ABIGAIL E. SMITH
Assistant Attorney General

ROB FARQUHARSON
Assistant Attorney General

Office of the Attorney General
Consumer Protection Division
12221 Merit Drive, Ste. 650
Dallas, Texas 75251
Tel: (214) 290-8830
Fax: (214) 969-7615

*Counsel for Appellant*

## Certificate of Compliance

Microsoft Word reports that this document contains 3,648 words, excluding exempted text.

*/s/ Abigail E. Smith*
ABIGAIL E. SMITH

15

# In the Court of Appeals
# for the Fifteenth Judicial District
# Austin, Texas

STATE OF TEXAS,

*Appellant*,

*v.*

NONPARTY PATIENT NO. 1, NONPARTY PATIENT NO. 2,
NONPARTY PATIENT NO. 3, NONPARTY PATIENT NO. 4,
NONPARTY PATIENT NO. 5, NONPARTY PATIENT NO. 6,
NONPARTY PATIENT NO. 7, AND NONPARTY PATIENT NO.
8, NONPARTY PATIENT NO. 9, NONPARTY PATIENT NO. 10,
AND NONPARTY PATIENT NO. 11,

*Appellees.*

On Appeal from the 95th Judicial District Court, Dallas County

## APPELLANT'S APPENDIX

Tab

1. Order Denying the State's Plea to the Jurisdiction and Plea in Abatement ................................................................ A

2. Tex. R. Civ. P. 176.6 ......................................................... B

3. Tex. R. Civ. P. 192.6 ......................................................... C

4. *Reata Constr. Corp. v. City of Dall.*, 197 S.W.3d 371 (Tex. 2006) ............. D

5. *Nazari v. State*, 561 S.W.3d 495 (Tex. 2018) ............................... E

16

# Tab A

Cause No. DC-25-01823

| | | |
|---|---|---|
| Nonparty Patient No. 1, | § | |
| Nonparty Patient No. 2, | § | IN THE DISTRICT COURT OF |
| Nonparty Patient No. 3, | § | |
| Nonparty Patient No. 4, | § | DALLAS COUNTY, TEXAS |
| Nonparty Patient No. 5, | § | |
| Nonparty Patient No. 6, | § | 95TH JUDICIAL DISTRICT |
| Nonparty Patient No. 7, | § | |
| Nonparty Patient No. 8, | § | |
| Nonparty Patient No. 9, | § | |
| Nonparty Patient No. 10, and | § | |
| Nonparty Patient No. 11, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| vs. | § | |
| | § | |
| The State of Texas, | § | |
| | § | |
| Defendant. | § | |

**[PROPOSED] ORDER DENYING
THE STATE'S PLEA TO THE JURISDICTION AND PLEA IN ABATEMENT**

Pending before the Court is the State's plea to the jurisdiction of this Court and plea in abatement. Having considered the pleadings, record evidence, and the parties' arguments, the Court finds that the State's pleas are hereby **DENIED**.

So **ORDERED** and **SIGNED** this 6th day of March 2025.

The Hon. Judge Monica Purdy
95th Judicial District Court
Dallas County, Texas

# Tab B

Vernon's Texas Rules Annotated
  Texas Rules of Civil Procedure
    Part II. Rules of Practice in District and County Courts
      Section 9. Evidence and Discovery (Refs & Annos)
        A. Evidence
          Rule 176. Subpoenas (Refs & Annos)

TX Rules of Civil Procedure, Rule 176.6

176.6. Response

Currentness

(a) *Compliance Required.* Except as provided in this subdivision, a person served with a subpoena must comply with the command stated therein unless discharged by the court or by the party summoning such witness. A person commanded to appear and give testimony must remain at the place of deposition, hearing, or trial from day to day until discharged by the court or by the party summoning the witness.

(b) *Organizations.* If a subpoena commanding testimony is directed to a corporation, partnership, association, governmental agency, or other organization, and the matters on which examination is requested are described with reasonable particularity, the organization must designate one or more persons to testify on its behalf as to matters known or reasonably available to the organization.

(c) *Production of Documents or Tangible Things.* A person commanded to produce documents or tangible things need not appear in person at the time and place of production unless the person is also commanded to attend and give testimony, either in the same subpoena or a separate one. A person must produce documents as they are kept in the usual course of business or must organize and label them to correspond with the categories in the demand. A person may withhold material or information claimed to be privileged but must comply with Rule 193.3. A nonparty's production of a document authenticates the document for use against the nonparty to the same extent as a party's production of a document is authenticated for use against the party under Rule 193.7.

(d) *Objections.* A person commanded to produce and permit inspection or copying of designated documents and things may serve on the party requesting issuance of the subpoena--before the time specified for compliance--written objections to producing any or all of the designated materials. A person need not comply with the part of a subpoena to which objection is made as provided in this paragraph unless ordered to do so by the court. The party requesting the subpoena may move for such an order at any time after an objection is made.

(e) *Protective Orders.* A person commanded to appear at a deposition, hearing, or trial, or to produce and permit inspection and copying of designated documents and things, and any other person affected by the subpoena, may move for a protective order under Rule 192.6(b)--before the time specified for compliance--either in the court in which the action is pending or in a district court in the county where the subpoena was served. The person must serve the motion on all parties in accordance with Rule 21a. A person need not comply with the part of a subpoena from which protection is sought under this paragraph unless ordered to do so by the court. The party requesting the subpoena may seek such an order at any time after the motion for protection is filed.

(f) *Trial Subpoenas.* A person commanded to attend and give testimony, or to produce documents or things, at a hearing or trial, may object or move for protective order before the court at the time and place specified for compliance, rather than under paragraphs (d) and (e).

**Credits**

Aug. 5, 1998 and Nov. 9, 1998, eff. Jan. 1, 1999.

Section 1 to Section 3, Rule 41 appear in this volume.

Vernon's Ann. Texas Rules Civ. Proc., Rule 176.6, TX R RCP Rule 176.6

Current with amendments received through February 1, 2025. Some rules may be more current, see credits for details.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Tab C

Vernon's Texas Rules Annotated
   Texas Rules of Civil Procedure
      Part II. Rules of Practice in District and County Courts
         Section 9. Evidence and Discovery (Refs & Annos)
            B. Discovery
               Rule 192. Permissible Discovery: Forms and Scope; Work Product; Protective Orders; Definitions (Refs & Annos)

TX Rules of Civil Procedure, Rule 192.6

192.6. Protective Orders

Currentness

(a) *Motion.* A person from whom discovery is sought, and any other person affected by the discovery request, may move within the time permitted for response to the discovery request for an order protecting that person from the discovery sought. A person should not move for protection when an objection to written discovery or an assertion of privilege is appropriate, but a motion does not waive the objection or assertion of privilege. If a person seeks protection regarding the time or place of discovery, the person must state a reasonable time and place for discovery with which the person will comply. A person must comply with a request to the extent protection is not sought unless it is unreasonable under the circumstances to do so before obtaining a ruling on the motion.

(b) *Order.* To protect the movant from undue burden, unnecessary expense, harassment, annoyance, or invasion of personal, constitutional, or property rights, the court may make any order in the interest of justice and may--among other things--order that:

   (1) the requested discovery not be sought in whole or in part;

   (2) the extent or subject matter of discovery be limited;

   (3) the discovery not be undertaken at the time or place specified;

   (4) the discovery be undertaken only by such method or upon such terms and conditions or at the time and place directed by the court;

   (5) the results of discovery be sealed or otherwise protected, subject to the provisions of Rule 76a.

**Credits**
Aug. 5, 1998 and Nov. 9, 1998, eff. Jan. 1, 1999.

Section 1 to Section 3, Rule 41 appear in this volume.

Vernon's Ann. Texas Rules Civ. Proc., Rule 192.6, TX R RCP Rule 192.6
Current with amendments received through February 1, 2025. Some rules may be more current, see credits for details.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Tab D

**Reata Const. Corp. v. City of Dallas, 197 S.W.3d 371 (2006)**

49 Tex. Sup. Ct. J. 811

KeyCite Yellow Flag - Negative Treatment

Declined to Extend by   Nazari v. State,   Tex.,   June 22, 2018

197 S.W.3d 371

Supreme Court of Texas.

REATA CONSTRUCTION

CORPORATION, Petitioner,

v.

CITY OF DALLAS, Respondent.

No. 02–1031
|
Argued Dec. 12, 2004.
|
Decided June 30, 2006.

**Synopsis**

**Background:** Owner of building that was damaged by water from a punctured water main brought negligence action against construction company and excavation subcontractor, and subcontractor filed third-party claim against city. City filed plea in intervention asserting a claim of negligence against subcontractor. The 162nd Judicial District Court, Dallas County, Bill Rhea, J., denied city's plea to the jurisdiction, and city appealed. The Court of Appeals, 83 S.W.3d 392, reversed. Subcontractor filed petition for review.

**Holdings:** On motion for rehearing, the Supreme Court, Johnson, J., held that:

[1] city did not have governmental immunity from subcontractor's claims germane to, connected to, and properly defensive to claims asserted by the city, to the extent any recovery on those claims would offset any recovery by the city;

[2] subcontractor's claims against city did not fall within Tort Claims Act's waiver of immunity for personal injury caused by a condition or use of property;

[3] statute providing that a home-rule municipality "may plead and be impleaded in any court" did not waive city's immunity; and

[4] city charter provision stating that city could "sue and be sued" and "implead and be impleaded" did not waive city's immunity.

Court of Appeals' judgment reversed and remanded.

Brister, J., filed concurring opinion in which Hecht and O'Neill, JJ., joined.

**Procedural Posture(s):** On Appeal.

West Headnotes (10)

**[1]** **States** Nature and scope of immunity in general

Sovereign immunity protects the state from lawsuits for money damages.

171 Cases that cite this headnote

**[2]** **Municipal, County, and Local Government** Waiver of and Exceptions to Immunity in General

Political subdivisions of the state, including cities, are entitled to immunity from lawsuits for money damages—referred to as governmental immunity—unless it has been waived.

270 Cases that cite this headnote

**[3]** **States** Necessity of waiver or consent

**States** Effect of waiver or consent

Sovereign immunity encompasses immunity from suit, which bars a suit unless the state has consented, and immunity from liability, which protects the state from judgments even if it has consented to the suit.

248 Cases that cite this headnote

**[4]** **States** Nature and scope of immunity in general

It is the judiciary's responsibility to define the boundaries of the common-law doctrine of sovereign immunity and to determine under what

circumstances sovereign immunity exists in the first instance.

56 Cases that cite this headnote

[5]    **Water Law**  ☞  Miscellaneous defects or failures

City did not have governmental immunity from excavation subcontractor's third-party claims for negligence, arising out of incident in which subcontractor drilled into water main due to city's alleged misidentification of water main's location and caused flooding to nearby building, to the extent that subcontractor's claims were germane to, connected to, and properly defensive to claims asserted by city, and to the extent any recovery on subcontractor's claims would offset any recovery by the city from subcontractor, where city had intervened in building owner's negligence lawsuit against subcontractor in order to assert negligence claim against subcontractor.

88 Cases that cite this headnote

[6]    **Municipal, County, and Local Government**  ☞  Other particular works

Excavation subcontractor's negligence claims against city, arising out of incident in which subcontractor drilled into water main due to city's alleged misidentification of water main's location and caused flooding to nearby building, did not fall within Tort Claims Act's waiver of city's immunity for personal injury caused by a condition or use of property, although tenants of building claimed that fumes from generators used in the flooded building after the water shorted out the electricity made them sick; Act waived immunity only if city was user of the property, and there was no claim that city was the user of the generators. V.T.C.A., Civil Practice & Remedies Code § 101.021(2).

4 Cases that cite this headnote

[7]    **Municipal, County, and Local Government**  ☞  Immunity and exceptions thereto in general

Section of Tort Claims Act waiving governmental unit's immunity for personal injury and death caused by a condition or use of tangible personal or real property only waives immunity when the governmental unit is the user of the property. V.T.C.A., Civil Practice & Remedies Code § 101.021(2).

27 Cases that cite this headnote

[8]    **Municipal, County, and Local Government**  ☞  Particular Cases and Contexts

Excavation subcontractor was not entitled to an opportunity to replead its negligence claims against city, before any dismissal of the subcontractor's claims due to city's governmental immunity, where city had twice filed special exceptions claiming that subcontractor failed to state a cause of action for which the city could be liable under the Tort Claims Act, and subcontractor had amended its petition twice, but its pleadings still failed to demonstrate a waiver of immunity. V.T.C.A., Civil Practice & Remedies Code § 101.021.

20 Cases that cite this headnote

[9]    **Water Law**  ☞  Miscellaneous defects or failures

Section of Local Government Code providing that a home-rule municipality "may plead and be impleaded in any court" did not waive city's governmental immunity from negligence claims asserted by excavation subcontractor, arising out of incident in which subcontractor drilled into water main due to city's alleged misidentification of water main's location and caused flooding to nearby building; waiver of immunity for tort claims was governed by Tort Claims Act, which was the later-enacted, more specific statute regarding waiver of immunity in tort cases, and phrase "plead and be impleaded" did not clearly and unambiguously reflect legislative intent to waive immunity. V.T.C.A., Civil Practice & Remedies Code § 101.021; ⚑V.T.C.A., Government Code § 311.026; V.T.C.A., Local Government Code § 51.075.

Reata Const. Corp. v. City of Dallas, 197 S.W.3d 371 (2006)

49 Tex. Sup. Ct. J. 811

62 Cases that cite this headnote

**[10]    Water Law** 👉 Overflow or Leakage

Provision of city charter stating that the city could "sue and be sued" and "implead and be impleaded" did not waive city's governmental immunity from negligence claims asserted by excavation subcontractor, arising out of incident in which subcontractor drilled into water main due to city's alleged misidentification of water main's location and caused flooding to nearby building; phrases "sue and be sued" and "implead and be impleaded" did not, separately or together, constitute a clear and unambiguous waiver of immunity from suit.

21 Cases that cite this headnote

**Attorneys and Law Firms**

**\*372** Lee L. Cameron Jr., Rebecca M. Alcantar, Amy Elizabeth Stewart, Jeffrey Osmon Marshall, Wilson Elser Moskovitz Edelman & Dicker LLP, Dallas, for petitioner.

**\*373** Charles S. Black Jr., Asst. City Atty., Julie B. Essenburg, Office of the City Atty. of City of Dallas, Deborah G. Hankinson, Law Office of Deborah Hankinson PC, Dallas, for respondent.

Malinda York Crouch, Sr. Asst. City Atty., Houston, Elliot Clark, Winstead Sechrest & Minick, P.C., Rafael Edward Cruz, Office of the Atty. Gen., Kristofer S. Monson, Asst. Solicitor Gen., Don Wayne Cruse Jr., Asst. Solicitor Gen., Austin, Bruce S. Powers, Asst. County Atty., Houston, William M. Boyd, John R. Stooksberry, Boyd Veigel, P.C., McKinney, Robert C. Lyon, Robert Lyon & Associates, Rowlett, Bob Gorsky, Lyon Gorsky Baskett, et al., Dallas, Delmar L. Cain, Office of Gen. Counsel, College Station, Miles T. Bradshaw, Feldman & Rogers, L.L.P., Dallas, for amicus curiae.

**Opinion**

Justice JOHNSON delivered the opinion of the Court, in which Chief Justice JEFFERSON, Justice WAINWRIGHT, Justice MEDINA, and Justice GREEN joined.

We grant the City of Dallas's motion for rehearing. We withdraw our opinion of April 2, 2004, and substitute the following in its place.

The issue in this case is whether the City of Dallas has governmental immunity from suit for claims by Reata Construction Corporation arising from the City's alleged negligence. The court of appeals held that the City had immunity. We conclude that the City does not have immunity from suit as to Reata's claims which are germane to, connected with, and properly defensive to the City's claims, to the extent Reata's claims offset those asserted by the City. We reverse the court of appeals' judgment and remand the case to the trial court for further proceedings.

**I. Background**

The City of Dallas issued Dynamic Cable Construction Corporation, Inc., a temporary license to install fiber optic cable in Dallas. Dynamic subcontracted with Reata Construction Corporation to do the drilling for the project. Reata inadvertently drilled into a thirty-inch water main, flooding a nearby building owned by Southwest Properties Group, Inc. Southwest sued Dynamic and Reata for negligence, and some tenants of the building intervened. Reata filed a third-party claim against the City alleging that the City negligently misidentified the water main's location. Before answering Reata's third-party claim, the City intervened in the case, asserting negligence claims against Dynamic. A few weeks after intervening in the suit, the City answered Reata's petition and filed special exceptions asserting that Reata's claims were not within the Texas Tort Claims Act's waiver of immunity. *See* TEX. CIV. PRAC. & REM. CODE § 101.021. The City subsequently filed an amended plea in intervention asserting claims of negligence against Reata and a plea to the jurisdiction asserting governmental immunity from suit. Reata filed a response claiming that (1) governmental immunity did not apply because the City subjected itself to the trial court's jurisdiction by intervening in the lawsuit and seeking affirmative relief; (2) the Dallas City Charter and section 51.075 of the Texas Local Government Code contain express waivers of governmental immunity because they provide, respectively, that the City may "sue or be sued" and "plead and be impleaded"; (3) under the common law, the City could not assert governmental immunity for its actions in failing to properly identify the water main's location prior to 1970 because water services were considered a proprietary

function; and (4) even if the Texas Tort Claims Act applied, Reata's claim fell **\*374** within the Act's waiver of immunity. The trial court denied the City's plea to the jurisdiction, and the City took an interlocutory appeal. *See* TEX. CIV. PRAC. & REM. CODE § 51.014(a)(8).

Rejecting each of Reata's asserted bases for a waiver of governmental immunity, the court of appeals reversed and dismissed Reata's claims against the City. 83 S.W.3d 400. The court of appeals held that even though the City intervened in the suit against Reata, by such action the City asserted its right to sue but did not waive its governmental immunity from suit. *Id.* at 398–400.

In *Anderson, Clayton & Co. v. State ex rel. Allred,* 122 Tex. 530, 62 S.W.2d 107, 110 (1933), we stated: "[W]here a state voluntarily files a suit and submits its rights for judicial determination it will be bound thereby and the defense will be entitled to plead and prove all matters properly defensive. This includes the right to make any defense by answer or cross-complaint germane to the matter in controversy." But the court of appeals relied on other language in that opinion providing that the State, having invoked the jurisdiction of the district court, was "subject to the same rules as other litigants, except in so far as such rules may be modified in favor of the State by statute or may be inapplicable or unenforceable because of exemptions inherent in sovereignty." 83 S.W.3d at 399 (quoting *Anderson,* 62 S.W.2d at 110). The court of appeals concluded that when a governmental entity intervenes in a lawsuit, "sovereign immunity still forecloses suit against that governmental entity." *Id.*

In this Court, Reata asserts (1) governmental immunity did not apply because the City subjected itself to the trial court's jurisdiction by intervening in the lawsuit and seeking affirmative relief; (2) the Dallas City Charter and section 51.075 of the Texas Local Government Code contain express waivers of governmental immunity because they provide, respectively, that the City may "sue or be sued" and "plead and be impleaded"; and (3) even if the Texas Tort Claims Act applied, Reata stated a claim within the Act's waiver of immunity.

## II. Sovereign Immunity

**[1] [2] [3]** "Sovereign immunity protects the State from lawsuits for money damages." *Tex. Natural Res. Conservation Comm'n v. IT–Davy,* 74 S.W.3d 849, 853 (Tex.2002). Political subdivisions of the state, including cities, are entitled to such immunity—referred to as governmental immunity—unless it has been waived. [1] *See Wichita Falls State Hosp. v. Taylor,* 106 S.W.3d 692, 694 n. 3 (Tex.2003). Sovereign immunity encompasses immunity from suit, which bars a suit unless the state has consented, and immunity from liability, which protects the state from judgments even if it has consented to the suit. *Tex. Dep't of Transp. v. Jones,* 8 S.W.3d 636, 638 (Tex.1999). We have held that sovereign immunity from suit deprives a trial court of subject-matter jurisdiction. *Tex. Dep't of Parks & Wildlife v. Miranda,* 133 S.W.3d 217, 224 (Tex.2004); *Jones,* 8 S.W.3d at 638.

[1] For ease of reference, we will use the term "sovereign immunity" to reference both sovereign immunity and governmental immunity.

**[4]** Sovereign immunity is a common-law doctrine that initially developed without any legislative or constitutional enactment. *See Cohens v. Virginia,* 6 Wheat. 264, 19 U.S. 264, 293, 5 L.Ed. 257 (1821) (recognizing the doctrine without citing statutory or constitutional authority); **\*375** *Hosner v. De Young,* 1 Tex. 764, 769 (1846) (same); *see also Tex. A & M University–Kingsville v. Lawson,* 87 S.W.3d 518, 520 (Tex.2002). We have consistently deferred to the Legislature to *waive* such immunity. *See IT–Davy,* 74 S.W.3d at 854; *Guillory v. Port of Houston Auth.,* 845 S.W.2d 812, 813 (Tex.1993); *Duhart v. State,* 610 S.W.2d 740, 741 (Tex.1980); *Lowe v. Tex. Tech Univ.,* 540 S.W.2d 297, 298 (Tex.1976). We have previously discussed the possibility that a governmental entity might waive its immunity by certain actions, even absent a legislative waiver of immunity. *See Catalina Dev., Inc. v. County of El Paso,* 121 S.W.3d 704, 705–06 (Tex.2003). However, there is tension between the concept of a governmental entity *waiving* its immunity from suit by some action independent from the Legislature's waiving immunity and the principle that only the Legislature can waive sovereign immunity. *See IT–Davy,* 74 S.W.3d at 853. There is also tension between the concept of a governmental entity waiving its immunity

Reata Const. Corp. v. City of Dallas, 197 S.W.3d 371 (2006)

49 Tex. Sup. Ct. J. 811

from suit and the principle that a court's lack of subject-matter jurisdiction generally cannot be waived. *See Fed. Underwriters Exch. v. Pugh,* 141 Tex. 539, 174 S.W.2d 598, 600 (1943). Recognizing that sovereign immunity is a common-law doctrine, we have not foreclosed the possibility that the judiciary may modify or abrogate such immunity by modifying the common law. *See Taylor,* 106 S.W.3d at 695–96; *see also Tex. Dep't of Criminal Justice v. Miller,* 51 S.W.3d 583, 593 (Tex.2001) (Hecht, J., concurring) (noting that judicial abolition of immunity may be necessary to prompt the Legislature to enact a reasoned system for determining the government's responsibility for its torts). Therefore, it remains the judiciary's responsibility to define the boundaries of the common-law doctrine and to determine under what circumstances sovereign immunity exists in the first instance.

We have generally deferred to the Legislature to waive immunity because the Legislature is better suited to address the conflicting policy issues involved. *See IT–Davy,* 74 S.W.3d at 854. A lack of immunity may hamper governmental functions by requiring tax resources to be used for defending lawsuits and paying judgments rather than using those resources for their intended purposes. *Id.* The Legislature has expressed its desire to preserve its interest in managing fiscal matters through the appropriations process by maintaining sovereign immunity unless it has clearly and unambiguously stated otherwise. TEX. GOV'T CODE § 311.034. The United States Supreme Court has also recognized that suits for money damages against states "may threaten the financial integrity of the States" and that "at the time of the founding, many of the States could have been forced into insolvency but for their immunity from private suits for money damages." *Alden v. Maine,* 527 U.S. 706, 750, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999). However, if the governmental entity interjects itself into or chooses to engage in litigation to assert affirmative claims for monetary damages, the entity will presumably have made a decision to expend resources to pay litigation costs. If the opposing party's claims can operate only as an offset to reduce the government's recovery, no tax resources will be called upon to pay a judgment, and the fiscal planning of the governmental entity should not be disrupted. Therefore, a determination that a governmental entity's immunity from suit does not extend to a situation where the entity has filed suit is consistent with the policy issues involved with immunity.

In this situation, we believe it would be fundamentally unfair to allow a governmental entity to assert affirmative claims against a party while claiming it had immunity as to the party's

**\*376** claims against it. *See Guar. Trust Co. v. United States,* 304 U.S. 126, 134–35, 58 S.Ct. 785, 82 L.Ed. 1224 (1938) (noting that the rule allowing claims against a foreign sovereign that has asserted its own claims is assumed to be founded on principles of justice); *see also Cunningham v. Parkdale Bank,* 660 S.W.2d 810, 813 (Tex.1983) (stating that fundamental fairness requires parties to be heard on the merits of their cases).

### III. Analysis

#### A. The City's Claim for Relief

Although there may have been some question after *Anderson* regarding whether sovereign immunity continues to exist when an affirmative claim for relief is filed by a governmental entity, subsequent cases indicate that under such circumstances immunity from suit no longer completely exists for the governmental entity.[2] In *State v. Humble Oil & Refining Co.,* 141 Tex. 40, 169 S.W.2d 707, 708 (1943), we considered whether a defendant in a tax suit could assert an offset against the State for taxes it had previously overpaid. The court of appeals concluded that the rule announced in *Anderson* applied: the defendant was entitled to claim an offset for any matter dependent upon or connected with the State's suit. *Id.* at 709. We stated that "[w]e have no fault to find with the rule of law announced in ... *Anderson* ... when applied in a proper case." *Id.* However, we went on to hold that the *Anderson* rule did not apply in *Humble Oil* because (1) its application would abolish the rule that taxes due the State cannot be offset, and (2) the defendant's claim was not connected with the State's claim as the two involved taxes for different months and years. *Id.* at 710. While our opinion in *Humble Oil* did not specifically address the issue of whether the trial court had jurisdiction over Humble's claims against the State, we acknowledged that in certain circumstances, a defendant would be entitled to assert a claim against the State if the State filed suit.

The City argues that *Anderson* is in conflict with two prior cases from this Court in which we held immunity had not been waived as to claims brought against the governmental entity plaintiffs by the defendants. *See Borden v. Houston,* 2 Tex. 594, 611 (1847); *Bates v. Republic,* 2 Tex. 616, 618 (1847). However, those cases are distinguishable from *Anderson* because they involved claims by the defendants for set-offs unrelated to the governmental entities' claims. *Borden,* 2 Tex. at 595–96; *Bates,* 2 Tex. at 616–17.

In *Kinnear v. Texas Commission on Human Rights,* 14 S.W.3d 299, 300 (Tex.2000), we acknowledged that the trial court had jurisdiction over claims against the State in a case where the State had filed suit. In *Kinnear,* the Texas Commission on Human Rights filed suit against Kinnear, alleging that he had violated the Texas Fair Housing Act. *Id.* at 299. Kinnear counterclaimed for attorney's fees as provided by the Act, and when he prevailed, the trial court awarded them. *Id.* at 300. In response to the question of whether the trial court had jurisdiction, we said that "[b]ecause the Commission initiated [the] proceeding under the Texas Fair Housing Act, and Kinnear claimed attorney fees as a consequence of that suit, the jurisdictional question in this case was answered when the Commission filed suit." *Id.* Later, four concurring justices in a plurality opinion cited *Kinnear* and *Anderson* for the proposition that "the State can waive immunity by filing suit." *IT–Davy,* 74 S.W.3d at 861 (Hecht, J., concurring).

In circumstances such as those now before us, where the governmental entity has joined into the litigation process by asserting its own affirmative claims for monetary relief, we see no ill befalling the governmental **\*377** entity or hampering of its governmental functions by allowing adverse parties to assert, as an offset, claims germane to, connected with, and properly defensive to those asserted by the governmental entity. And, our decisions that immunity from suit does not bar claims against the governmental entity if the claims are connected to, germane to, and defensive to the claims asserted by the entity, in effect, modified the common-law immunity doctrine and, to an extent, abrogated immunity

of the entity that filed suit. *See Humble Oil,* 169 S.W.2d at 710; *Anderson,* 62 S.W.2d at 110.

**[5]** Therefore, we hold that the decision by the City of Dallas to file suit for damages encompassed a decision to leave its sphere of immunity from suit for claims against it which are germane to, connected with and properly defensive to claims the City asserts. Once it asserts affirmative claims for monetary recovery, the City must participate in the litigation process as an ordinary litigant, save for the limitation that the City continues to have immunity from affirmative damage claims against it for monetary relief exceeding amounts necessary to offset the City's claims. Moreover, we see no substantive difference between a decision by the City to file an original suit and the City's decision to file its claim as an intervenor in Southwest's suit. Accordingly, when the City filed its affirmative claims for relief as an intervenor, the trial court acquired subject-matter jurisdiction over claims made against the City which were connected to, germane to, and properly defensive to the matters on which the City based its claim for damages. *See Anderson,* 62 S.W.2d at 110. Absent the Legislature's waiver of the City's immunity from suit, however, the trial court did not acquire jurisdiction over a claim for damages against the City in excess of damages sufficient to offset the City's recovery, if any. *See City of LaPorte v. Barfield,* 898 S.W.2d 288, 297 (Tex.1995); *Anderson,* 62 S.W.2d at 110 (holding that when a governmental entity files suit, "the defense will be entitled to plead and prove all matters properly defensive"). [3]

---

3    At the time *Anderson* was decided, a claim of an offset was referred to as a defensive matter. *See Sw. Contract Purchase Corp. v. McGee,* 120 Tex. 240, 36 S.W.2d 978, 979 (1931) (stating "defendant in error pleaded in defense ... certain offsets and defenses").

Because the City's assertion of claims for damages against Reata means that the City does not have immunity from Reata's claims to the limited extent we have explained above, we must consider Reata's remaining arguments to determine if the City's immunity from suit has been completely waived in some manner.

**B. Texas Tort Claims Act**

Reata Const. Corp. v. City of Dallas, 197 S.W.3d 371 (2006)

49 Tex. Sup. Ct. J. 811

**[6]** Reata claims that the court of appeals erred in holding that its claims against the City do not fit within any waiver of immunity under the Tort Claims Act. Specifically, Reata claims that the court of appeals did not liberally construe its pleadings as asserting damages for personal injuries. *See* *Tex. Dep't of Transp. v. Ramirez,* 74 S.W.3d 864, 867 (Tex.2002) (noting that pleadings should be liberally construed in favor of jurisdiction).

Through the Tort Claims Act, the Legislature has waived the City's immunity for "personal injury and death so caused by a condition or use of tangible personal or real property if the governmental unit would, were it a private person, be liable to the claimant according to Texas law." TEX. CIV. PRAC. & REM. CODE § 101.021(2).

**[7]** The court of appeals concluded that none of the damages claimed against the **\*378** City—property and mental anguish damages—were recoverable under that subsection. 83 S.W.3d at 396. Reata argues that a claim for personal injury damages was made as the intervenors asserted that fumes from generators used in the flooded building after the water shorted out the electricity made them sick. However, section 101.021(2) only waives immunity when the governmental unit is the user of the property. *San Antonio State Hosp. v. Cowan,* 128 S.W.3d 244, 245–46 (Tex.2004). There is no claim that the City was the user of the generators.

**[8]** Reata also argues that if its claim was not properly pleaded to demonstrate a waiver of immunity, it should be given the opportunity to amend before its case is dismissed. *See* *Tex. Dep't of Parks & Wildlife v. Miranda,* 133 S.W.3d 217, 226–27 (Tex.2004). But, in the trial court, the City twice filed special exceptions claiming that Reata failed to state a cause of action for which the City could be liable under the Tort Claims Act. Reata amended its petition twice, but its pleadings still fail to demonstrate a waiver of immunity. Accordingly, we hold that the court of appeals correctly determined that Reata's claims do not fit within any waiver of immunity under the Tort Claims Act and that Reata was not entitled to replead.

### C. Waiver of Immunity by the Local Government Code and City Charter

**[9]** Reata also claims the City's immunity from suit is waived by section 51.075 of the Local Government Code, which provides that a home-rule municipality "may plead and be impleaded in any court." *See* TEX. LOC. GOV'T CODE § 51.075. However, waiver of immunity for tort claims is governed by the Texas Tort Claims Act. *See* TEX. CIV. PRAC. & REM. CODE ch. 101; *Miranda,* 133 S.W.3d at 224–25 (holding that the governmental entity was immune from suit for a tort unless it was expressly waived by the Tort Claims Act). Under rules of statutory construction, we give precedence to the Tort Claims Act over section 51.075 because the Tort Claims Act is the later-enacted, more specific statute regarding waiver of immunity in tort cases. *See* TEX. GOV'T CODE § 311.026. Moreover, in *Tooke v. City of Mexia,* 197 S.W.3d 325, 342, 2006 WL 1792223 (Tex.2006), we have held that the phrase "plead and be impleaded" in section 51.075 does not clearly and unambiguously reflect legislative intent to waive immunity from suit. *See* *Taylor,* 106 S.W.3d at 697–98 (Tex.2003).

**[10]** Reata also claims the City's immunity is waived by the Dallas City Charter which states that the City may "sue and be sued" and "implead and be impleaded." DALLAS, TEX., CITY CHARTER ch. II, § 1(2), (3). As we explain in *Tooke,* such phrases, separately or together, do not comprise a clear and unambiguous waiver of immunity to suit. *Tooke,* 197 S.W.3d at 342. The City Charter provision does not waive the City's immunity from suit. *See* *id.*

### IV. Conclusion

Because the City asserted affirmative claims for monetary relief against Reata, the City does not have immunity from Reata's claims germane to, connected to, and properly defensive to claims asserted by the City, to the extent any recovery on those claims will offset any recovery by the City from Reata. We reverse the court of appeals' judgment and remand the case to the trial court for further proceedings consistent with this opinion.

Justice BRISTER filed a concurrence in which Justice HECHT and Justice O'NEILL joined.

Justice WILLETT did not participate in the decision.

Reata Const. Corp. v. City of Dallas, 197 S.W.3d 371 (2006)

49 Tex. Sup. Ct. J. 811

**\*379** Justice BRISTER, joined by Justice HECHT and Justice O'NEILL, concurring.

I join in the Court's judgment, as American law has long held that a government waives immunity from suit by filing an affirmative claim in court. I write separately because I disagree with the State that this rule is mistaken, and with the Court that we must partially abrogate sovereign immunity because the rule is in "tension" with other jurisdictional rules. Instead, sovereign immunity has always had its own set of jurisdictional rules because jurisdiction over private and public parties is simply different.

In all cases, whether the parties are public or private, a court must have jurisdiction to issue a binding judgment. But "[j]urisdiction," as the United States Supreme Court recently observed, "is a word of many, too many, meanings." [1] Both subject-matter jurisdiction and personal jurisdiction are "jurisdictional" in that a court cannot enter judgment without them. [2] Sovereign immunity is also "jurisdictional," but in ways that do not fit neatly into the other two categories.

[1] *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 90, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) (internal quotation marks omitted).

[2] *See* *Ruhrgas AG v. Marathon Oil Co.,* 526 U.S. 574, 583–84, 119 S.Ct. 1563, 143 L.Ed.2d 760 (1999); *CSR Ltd. v. Link,* 925 S.W.2d 591, 594 (Tex.1996); *see also* *Anderson, Clayton & Co. v. State,* 122 Tex. 530, 62 S.W.2d 107 (1933).

Subject-matter jurisdiction concerns a court's power over cases. [3] It stems from the doctrine of separation of powers, and aims to keep the judiciary from encroaching on subjects properly belonging to another branch of government. [4] Subject-matter jurisdiction cannot be waived or conferred by agreement, must be considered by a court *sua sponte,* and can be raised for the first time on appeal. [5]

[3] *See* *Arbaugh v. Y & H Corp.,* 546 U.S. 500, ——, 126 S.Ct. 1235, 1244, 163 L.Ed.2d 1097 (2006); *CSR Ltd.,* 925 S.W.2d at 594.

[4] *See* *Texas Ass'n of Bus. v. Texas Air Control Bd.,* 852 S.W.2d 440, 444 (Tex.1993).

[5] *See* *Univ. of Texas Sw. Med. Ctr. v. Loutzenhiser,* 140 S.W.3d 351, 358 (2004).

Personal jurisdiction, by contrast, concerns a court's power over parties. [6] A court cannot enter judgment against a party who has not been haled into court through proper service, [7] and its writ extends beyond its borders only as far as due process allows. [8] Personal jurisdiction can be voluntarily waived by appearance, [9] or impliedly by an untimely objection. [10]

[6] *See* *CSR Ltd.,* 925 S.W.2d at 594.

[7] *See* *Wilson v. Dunn,* 800 S.W.2d 833, 836 (Tex.1990).

[8] *See* *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 292, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980).

[9] *See* *Hilburn v. Jennings,* 698 S.W.2d 99, 100 (Tex.1985).

[10] *See* TEX. R. CIV. P. 120a.

Throughout Texas history, we have held that sovereign immunity is "jurisdictional" [11] but without characterizing it as either subject-matter or personal jurisdiction. To the contrary, in *Anderson, Clayton* we held that when the State waived immunity by filing suit, the trial court "acquired jurisdiction of the *parties and subject-matter*." **\*380** [12]

[11] *See, e.g.,* *Missouri Pacific R.R. Co. v. Brownsville Navigation Dist.,* 453 S.W.2d 812, 814 (Tex.1970); *State v. Lain,* 162 Tex. 549, 349 S.W.2d 579, 581–82 (1961); *W.D. Haden Co. v. Dodgen,* 158 Tex. 74, 308 S.W.2d 838, 841 (1958); *Walsh v. Univ. of Tex.,* 169 S.W.2d 993, 994 (Tex.Civ.App.-El Paso 1942, writ ref'd).

Reata Const. Corp. v. City of Dallas, 197 S.W.3d 371 (2006)

49 Tex. Sup. Ct. J. 811

12 *Anderson, Clayton,* 62 S.W.2d at 110 (emphasis added).

In the last seven years we have addressed sovereign immunity almost exclusively in terms of subject-matter jurisdiction. [13] This approach began with a per curiam opinion in 1999, [14] which distinguished a 1988 opinion that appeared to say the opposite. [15] But acknowledging that sovereign immunity implicates subject-matter jurisdiction does not mean it does not implicate personal jurisdiction, too. Indeed, the earliest Texas cases, dating even from the Republic, addressed sovereign immunity in terms of "amenability" to suit, [16] a term borrowed for personal jurisdiction. [17]

13 *See, e.g., Tex. Dep't of Parks & Wildlife v. Miranda,* 133 S.W.3d 217, 224 (Tex.2004); *Tex. Natural Res. Conservation Comm'n v. IT–Davy,* 74 S.W.3d 849, 855 (Tex.2002); *Dep't of Transp. v. Garza,* 70 S.W.3d 802, 808 (Tex.2002); *Tex. Dep't of Criminal Justice v. Miller,* 51 S.W.3d 583, 585 (Tex.2001).

14 *See Tex. Dep't of Transp. v. Jones,* 8 S.W.3d 636, 638 (Tex.1999) (per curiam).

15 *See Davis v. City of San Antonio,* 752 S.W.2d 518, 520 (Tex.1988) ("We do not read our opinion in *Duhart* [a previous sovereign immunity case] as holding that the trial court lacked subject matter jurisdiction of the case and that any judgment rendered for the plaintiff would have been void."). Between 1988 and 1999, the Seventh Court of Appeals had suggested sovereign immunity concerned both. *See Bd. of County Comm'rs of County of Beaver Okl. v. Amarillo Hosp. Dist.,* 835 S.W.2d 115, 130 n. 2 (Tex.App.-Amarillo 1992, no writ) ("[S]overeign immunity concerns *both* subject matter jurisdiction and personal jurisdiction.") (emphasis added); *Laykin v. McFall,* 830 S.W.2d 266, 267 n. 1 (Tex.App.-Amarillo 1992, no writ) (same).

16 *See, e.g., Kenedy v. Jarvis,* 1 S.W. 191, 194 (Tex.1886); *Bd. of Land Comm'rs v. Walling,* Dallam 524 (Tex.1843) ("[I]t is one of the essential attributes of sovereignty not to be amenable to the suit of a private person without its own consent ...").

17 *See, e.g.,* TEX. FAM. CODE § 157.375(a) ("While in this state for the sole purpose of compelling the return of a child through a habeas corpus proceeding, the relator is not *amenable* to civil process and is not subject to the jurisdiction of any civil court except the court in which the writ is pending.") (emphasis added); TEX. R. CIV. P. 120a(1) (providing for special appearances to object to jurisdiction "over the person or property of the defendant on the ground that such party or property is not *amenable* to process issued by the courts of this State") (emphasis added).

These early Texas cases were not aberrations; sovereign immunity has historically been considered a problem primarily of personal jurisdiction. Blackstone addressed sovereign immunity under "The Rights of Persons," concluding that sovereign immunity arises from the nature of the sovereign party, not the subject matter of the sovereign's case:

> Hence it is, that no suit or action can be brought against the king, even in civil matters, because no court can have jurisdiction over him. For all jurisdiction implies superiority of power: authority to try would be vain and idle, without an authority to redress; and the sentence of a court would be contemptible, unless that court had power to command the execution of it; but who, says Finch, shall command the king? [18]

18 1 William Blackstone, COMMENTARIES ON THE LAWS OF ENGLAND *235.

Once bereft of kings, the earliest American cases still viewed sovereign immunity in terms of personal jurisdiction. [19] In *The Federalist* No. 81, Alexander Hamilton borrowed the language of personal jurisdiction **\*381** in stating, "It is inherent in the nature of sovereignty not to be amenable to the

Reata Const. Corp. v. City of Dallas, 197 S.W.3d 371 (2006)

49 Tex. Sup. Ct. J. 811

suit of an individual WITHOUT ITS CONSENT."[20] In the United States Supreme Court's first major opinion, the state of Georgia refused to file a plea or appear at oral argument for fear that its appearance would waive sovereign immunity.[21]

[19] *See generally* Caleb Nelson, *Sovereign Immunity as a Doctrine of Personal Jurisdiction,* 115 HARV.L.REV. 1559 (2002).

[20] THE FEDERALIST NO. 81 (emphasis in original).

[21] *See* Nelson, *supra* note 19 at 1598 (discussing *Chisholm v. Georgia,* 2 U.S. (2 Dall.) 419, 1 L.Ed. 440 (1793)).

The full story is that sovereign immunity includes concerns about both subject-matter and personal jurisdiction, but is identical to neither. In terms of subject matter, whether a government ought to compensate particular claimants involves policy issues beyond the traditional scope of judicial proceedings.[22] But at the same time, there is some incongruity in saying that routine tort and contract suits are beyond the traditional subject matter of the courts simply because one party is a government employee.[23]

[22] *See* *Fed. Sign v. Tex. S. Univ.,* 951 S.W.2d 401, 414 (Tex.1997) (Hecht, J., concurring) ("[N]ot all the factors that weigh in determining the State's liability on its contracts can be assessed in a judicial proceeding.").

[23] *See* *State v. Snyder,* 66 Tex. 687, 18 S.W. 106, 107 (1886) ( "The state, as a plaintiff, has the same right as other plaintiffs to institute and maintain actions in the district courts upon any cause of action of which, under the terms of the constitution, such courts have jurisdiction, and so by force of the jurisdiction conferred on such courts by the constitution, and without reference to any statutory authorization.").

Similarly, concerns about a court's power to order the government to appear, give evidence, and pay a judgment share much in common with personal jurisdictional limits over foreign parties. Yet, it seems awkward to say Texas courts cannot "reach" other Texas governmental units, when all necessarily share the same space, and sometimes the same buildings.

Given these similarities and differences with each doctrine, it should come as no surprise that the jurisdictional rules governing sovereign immunity borrow from both but are identical to neither. Thus, just like subject-matter jurisdiction, sovereign immunity may be raised by the court even if the parties do not.[24] But like personal jurisdiction, Texas law has long held that a governmental entity waives immunity by filing suit on an affirmative claim.[25]

[24] *Compare* *Tex. Dep't of Parks and Wildlife v. Miranda,* 133 S.W.3d 217, 226 (Tex.2004) ("The trial court must determine at its earliest opportunity whether it has the constitutional or statutory authority to decide the case before allowing the litigation to proceed."), *with* *Mayhew v. Town of Sunnyvale,* 964 S.W.2d 922, 928 (Tex.1998) (raising ripeness issue *sua sponte* as an element of subject-matter jurisdiction).

[25] *Kinnear v. Tex. Comm'n on Human Rights,* 14 S.W.3d 299, 300 (Tex.2000); *Anderson, Clayton & Co. v. State,* 122 Tex. 530, 62 S.W.2d 107, 110 (1939).

Federal cases addressing the sovereign immunity of the states reflect this same hybrid nature, including elements of both subject-matter and personal jurisdiction.[26] And like the Texas rule, there is no question that states waive immunity from suit **\*382** in federal court by claiming an interpleaded fund,[27] filing a bankruptcy claim,[28] or removing a case to federal court.[29]

[26] *See* *Wisc. Dep't of Corr. v. Schacht,* 524 U.S. 381, 394, 118 S.Ct. 2047, 141 L.Ed.2d 364 (1998) (Kennedy, J., concurring) ("In certain respects, the immunity [accorded states by the Eleventh Amendment] bears substantial similarity to personal jurisdiction requirements, since it can be waived and courts need not raise the issue sua sponte. Permitting the immunity to be raised at any stage of the proceedings, in contrast, is more consistent with regarding [it] as a limit on the federal courts' subject-matter jurisdiction.") (citations omitted).

27     See ⚑*Clark v. Barnard,* 108 U.S. 436, 447–48, 2 S.Ct. 878, 27 L.Ed. 780 (1883).

28     See ⚑*Gardner v. New Jersey,* 329 U.S. 565, 573–75, 67 S.Ct. 467, 91 L.Ed. 504 (1947); *see also* ⚑*Cent. Va. Cmty. Coll. v. Katz,* 546U.S. 356, ——, 126 S.Ct. 990, 1004, 163 L.Ed.2d 945 (2006) (holding that States agreed "not to assert any sovereign immunity defense they might have had in proceedings brought" in bankruptcy).

29     See ⚑*Lapides v. Bd. of Regents of Univ. Sys. of Ga.,* 535 U.S. 613, 616, 122 S.Ct. 1640, 152 L.Ed.2d 806 (2002).

Thus, the jurisdictional rules of sovereign immunity cannot be derived by simply plugging in the rules of subject-matter or personal jurisdiction governing private parties and cases. For one thing, those rules conflict. And because sovereign immunity includes elements of both but all of neither, there is no general rule about which should apply or be preempted.

Rather than abrogating sovereign immunity piecemeal or adopting rules governing either subject-matter or personal jurisdiction wholesale, we should look to those rules for guidance, applying them (or a hybrid of them) according to the purposes and peculiar necessities of sovereign immunity. This is precisely what the Court has done when considering arguments to limit or abolish sovereign immunity completely, looking to the purposes behind the doctrine for guidance.[30] Considering those same purposes here shows why the traditional rule that a sovereign's affirmative claim waives immunity from suit is the right one.

30     See ⚑*Wichita Falls State Hosp. v. Taylor,* 106 S.W.3d 692, 695–96 (Tex.2003).

First, sovereign immunity is founded on the presumption that governments will do justice to their citizens, by one means or another.[31] By filing suit in court, a government makes clear that it has chosen to pursue justice (and presumably not just for itself) through litigation, at least in that particular case.

31     *State v. Snyder,* 66 Tex. 687, 18 S.W. 106, 109 (1886) ("It is to be conclusively presumed, in the absence of a statute authorizing suit against the state in reference to a given matter, that it fully

recognizes every just claim the citizen has against it, that in its own way it will do justice in reference thereto, and that it has ability to do so; and this is one of the reasons why no suit can be brought against the state without its consent."); ⚑*Borden v. Houston,* 2 Tex. 594, 611–12 (1847); *Bd. of Land Comm'rs v. Walling,* Dallam 524 (Tex.1843).

Second, "[c]oercion ... is incompatible with sovereignty."[32] Without some indication of consent, "the powers of judicial tribunals, however great they may be, are not of a character so transcendent as to enable them to afford [a] remedy."[33] But when a government voluntarily seeks affirmative relief from the courts, it is not coercion but cooperation for the courts to adjudicate the matter.

32     ⚑*Borden,* 2 Tex. at 611.

33     *Walling,* Dallam 524 (cited with approval by this Court in *Kenedy v. Jarvis,* 1 S.W. 191, 194 (Tex.1886)); *accord, Snyder,* 18 S.W. at 106, 110; ⚑*Bates v. Republic,* 2 Tex. 616 (1847).

Third, sovereign immunity protects the government from the distraction and expenses that would ensue if citizens could sue the government whenever they pleased.[34] But again, when the government **\*383** brings its own affirmative claims, it has obviously concluded that the distraction and expense of litigation is worthwhile in that particular case.

34     ⚑*Texas Natural Res. Conservation Comm'n v. IT–Davy,* 74 S.W.3d 849, 854 (Tex.2002); *Walling,* Dallam at 525–26 (Tex.1843) ("The experience of ages and the wisdom of the most enlightened statesmen and judicial expositors have sanctioned the doctrine that less injury would arise from the delay or even the denial of justice to individuals than from the distraction and imbecility consequent upon the government's being involved in continual and harassing controversies at the will or caprice of every citizen in the community.").

Fourth, the protection sovereign immunity affords to the public fisc suggests that a government waiver by filing a claim should be limited to that claim's extent.[35] Absent sovereign immunity, policy decisions regarding government spending would be made by judges and juries, not the Legislature.[36] That might still be the case if, when a government asserted its

Reata Const. Corp. v. City of Dallas, 197 S.W.3d 371 (2006)

49 Tex. Sup. Ct. J. 811

own claim, it waived sovereign immunity as to much larger counterclaims and entirely different transactions. By filing suit on a claim, a government consents to have the courts decide its entitlement to a particular sum, but no more.

[35] *State v. Humble Oil & Ref. Co.,* 141 Tex. 40, 169 S.W.2d 707 (1943); *Snyder,* 18 S.W. at 110; *Borden,* 2 Tex. at 611–12 (1847); *Bates,* 2 Tex. at 618.

[36] *IT–Davy,* 74 S.W.3d at 854 ("Subjecting the government to liability may hamper governmental functions by shifting tax resources away from their intended purposes toward defending lawsuits and paying judgments."); *Bates,* 2 Tex. at 618.

Finally, while courts in these cases see separation among the branches, parties sued by the State may see only different parts of the same tree. This paradoxical three-in-one structure (which no doubt resonated with the trinitarian Founders) [37] requires the courts at some point to insist that "[t]here is not one law for the sovereign and another for the subject." [38] A rule allowing governments to make a claim but preventing all offsetting claims looks less like sovereign immunity than sovereign inequity.

[37] *Cf.* Note, *The Twenty Dollars Clause,* 118 HARV.L.REV. 1665, 1680 (2005) ("In an analogy that would have resonated with the Founders, the trilogy of life, liberty, and property was as the Christian trinity of Father, Son, and Holy Spirit: three-in-one; the same, but different.").

[38] *Fristoe v. Blum,* 92 Tex. 76, 45 S.W. 998, 1000 (1898) (quoting *People v. Stephens,* 71 N.Y. 527, 549).

Thus, the traditional rule of limited waiver by appearance is consistent with all of the purposes of sovereign immunity. It is not in "tension" with the jurisdictional rules governing private parties; it is simply a different rule.

Nor do I see any unresolvable tension between this rule and our frequent statements that sovereign immunity must be waived by the Legislature in clear and unambiguous terms, [39] for several reasons. First, while the Legislature has taken an active role in deciding which particular suits may be filed *against* governmental units, [40] it has not played the same role in limiting which particular suits may be filed *by* them. Trying to collect an affirmative claim does not raise the same kinds of concerns as trying to avoid one.

[39] *See, e.g.,* *Wichita Falls State Hosp. v. Taylor,* 106 S.W.3d 692, 696 (Tex.2003); *IT–Davy,* 74 S.W.3d at 854; *Univ. of Tex. Med. Branch at Galveston v. York,* 871 S.W.2d 175, 177 (Tex.1994); *Duhart v. State,* 610 S.W.2d 740, 742 (Tex.1980).

[40] *See* *IT–Davy,* 74 S.W.3d at 862 (Hecht, J., concurring).

Second, while the Legislature may waive immunity in individual suits, in recent years it has done so quite rarely. [41] Given the press of other business in a rapidly growing state, it is unrealistic to expect immunity decisions to be made piecemeal rather than collectively. The reasons for strictly construing waiver for whole classes **\*384** of suits against the government are not the same when a single government unit files a single case.

[41] *See* *id.*

Finally, when governments bring suit, they must do so through agents who ultimately derive their authority from the Legislature. [42] Those agents generally are not authorized to waive immunity from liability, or immunity from suit in individual cases. But when they file suit on an affirmative claim, they must be doing so with legislative authorization. If the rule were otherwise, it is not clear how a government could ever assert its own claims.

[42] *See* *Pub. Util. Comm'n v. City Pub. Serv. Bd. of San Antonio,* 53 S.W.3d 310, 316 (Tex.2001).

This Court found it "well settled" more than 100 years ago that governments who file suit must follow the same rules as the governed:

> It is well settled that so long as the state is engaged in making or enforcing laws, or in the discharge of

**Reata Const. Corp. v. City of Dallas, 197 S.W.3d 371 (2006)**

49 Tex. Sup. Ct. J. 811

any other governmental function, it is to be regarded as a sovereign, and has prerogatives which do not appertain to the individual citizen; but when it becomes a suitor in its own courts, or a party to a contract with a citizen, the same law applies to it as under like conditions governs the contracts of an individual. [43]

When a government voluntarily enters a contract, it waives sovereign immunity from liability (though not suit) to that extent; [44] when a government voluntarily files suit, it waives sovereign immunity from suit (though not liability) to that extent as well. Because the City of Dallas filed an affirmative claim here, it waived immunity from suit to that extent.

[44]    *See* 🚩 *Fed. Sign v. Tex. S. Univ.,* 951 S.W.2d 401, 405–06 (Tex.1997).

**All Citations**

197 S.W.3d 371, 49 Tex. Sup. Ct. J. 811

[43]    *Fristoe,* 45 S.W. at 999.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Tab E

561 S.W.3d 495
Supreme Court of Texas.

Dr. Behzad NAZARI, D.D.S., et al., Petitioners,

v.

The STATE of Texas; Xerox Corporation;
and Xerox State Healthcare, LLC f/k/
a ACS State Healthcare, LLC, Respondents

No. 16-0549
|
Argued February 6, 2018
|
OPINION DELIVERED: June 22, 2018
|
Rehearing Denied December 14, 2018

**Synopsis**

**Background:** State brought action against dental services providers alleging fraud in violation of the Texas Medicaid Fraud Prevention Act, and providers counterclaimed for conspiracy, breach of contract, and conversion and brought third-party claims against state contractor administering the program for common-law fraud, breach of contract, promissory estoppel, negligent hiring, negligent supervision, negligence, and gross negligence. The District Court, Travis County, 53rd Judicial District, Stephen Yelenosky, J., granted State's plea to the jurisdiction on the counterclaims and granted State's motion to dismiss third-party claims. Providers filed interlocutory appeal. The Austin Court of Appeals, 497 S.W.3d 169, affirmed the dismissal of the counterclaims and dismissed the appeal regarding the third-party claims. Providers' petition for review was granted.

**Holdings:** The Supreme Court, Brown, J., held that:

[1] as a matter of first impression, State seeking a transfer of funds is insufficient to preclude protections of sovereign immunity;

[2] as a matter of first impression, sovereign immunity barred dental service providers from asserting counterclaims;

[3] as a matter of first impression, sovereign immunity protects State from counterclaims that seek to offset a penalty; and

[4] the appellate courts lacked interlocutory jurisdiction to address dismissal of third-party claims.

Judgment of the Court of Appeals affirmed.

Lehrmann, J., concurred in part, dissented in part, and filed opinion in which Johnson, J., joined.

See also 2018 WL 3077704.

**Procedural Posture(s):** Petition for Discretionary Review; Interlocutory Appeal; Plea to the Jurisdiction; Motion to Dismiss.

West Headnotes (19)

**[1]** **States** Necessity of waiver or consent

The common-law doctrine of "sovereign immunity" prohibits suits against the state unless the state consents and waives its immunity.

19 Cases that cite this headnote

**[2]** **States** Nature and scope of immunity in general

Sovereign immunity from suit implicates a court's subject-matter jurisdiction, because it recognizes the courts' limited authority over the sovereign creating them.

13 Cases that cite this headnote

**[3]** **States** Nature and scope of immunity in general

When it applies, sovereign immunity from suit operates to shield the public from the costs and consequences of improvident actions of their governments.

3 Cases that cite this headnote

**[4]** **States** Power to waive immunity or consent to suit

Although the state may elect to waive its sovereign immunity, that policy decision belongs largely to the legislature.

**[5]** States Mode and sufficiency of waiver or consent

The legislature may waive the state's sovereign immunity by statute or by legislative resolution.

8 Cases that cite this headnote

**[6]** States Mode and sufficiency of waiver or consent

If the legislature elects to waive sovereign immunity, it must do so by clear and unambiguous language. Tex. Gov't Code Ann. § 311.034.

5 Cases that cite this headnote

**[7]** States Power to waive immunity or consent to suit

Although courts defer to the legislature to determine whether the state has waived immunity, sovereign immunity is a common-law creation, and the responsibility to define the boundaries of the doctrine remains with the judiciary.

9 Cases that cite this headnote

**[8]** Municipal, County, and Local Government Entities Entitled to Immunity

A governmental entity does not have sovereign immunity from suit for monetary claims against it that are germane to, connected with, and properly defensive to affirmative claims made by the entity, to the extent that the claims against the entity offset the entity's own claims.

6 Cases that cite this headnote

**[9]** Municipal, County, and Local Government Waiver of and Exceptions to Immunity in General

A governmental entity does not waive its sovereign immunity by filing a claim for affirmative relief; instead, the scope of governmental immunity does not reach the defensive counterclaims to the extent that any recovery on the counterclaims serves as an offset against the government's recovery.

9 Cases that cite this headnote

**[10]** States Mode and sufficiency of waiver or consent

The state's assertion of a claim for monetary relief, standing by itself, is not enough to trigger the abrogation-of-immunity rule; the fact that the state seeks a transfer of funds is not sufficient to place it beyond the protections that sovereign immunity from suit affords.

2 Cases that cite this headnote

**[11]** States Particular Claims and Actions

States Intentional torts in general

Sovereign immunity barred dental service providers from asserting counterclaims for conspiracy, breach of contract, and conversion against State, in State's action for fraud under Texas Medicaid Fraud Prevention Act; arguments for conspiracy and breach of contract had nothing to do with whether providers violated Act, conversion counterclaim would have never resulted in an offset, and State sought monetary penalty under Act, rather than damages. Tex. Hum. Res. Code Ann. § 36.052.

2 Cases that cite this headnote

**[12]** States Mode and sufficiency of waiver or consent

The rule under which the state, by participating in certain litigation, steps outside the sphere of protection that common-law sovereign immunity from suit provides never applies when the state initiates litigation to enforce a substantive prohibition against unlawful conduct by imposing a monetary penalty.

**[13]** **States** ⚬ Nature and scope of immunity in general

Sovereign immunity protects the state from counterclaims that seek to offset a penalty.

8 Cases that cite this headnote

**[14]** **Penalties** ⚬ Persons liable

Penalties are inherently one-sided; citizens cannot claim a penalty against the state, but the state can and does frequently assess fines, penalties, and sanctions against its citizens.

**[15]** **States** ⚬ Particular Claims and Actions

A citizen seeking to offset a penalty must assert some other, non-penal source of the state's liability, such as a tort, or a contract.

**[16]** **States** ⚬ Nature and scope of immunity in general

A penalty cannot be offset against the state any more than a prison sentence.

**[17]** **Appeal and Error** ⚬ On motion for dismissal or nonsuit

Appellate courts lacked interlocutory jurisdiction to address whether trial court erred in dismissing dental service providers' third-party claims against state contractor administering Medicaid program, in State's action against providers for violation of Texas Medicaid Fraud Prevention Act; State moved to dismiss providers' third-party claims against contractor on ground that Act did not permit third-party claims, which was non-jurisdictional ground. Tex. Hum. Res. Code Ann. § 36.001 et seq.

4 Cases that cite this headnote

**[18]** **Appeal and Error** ⚬ Interlocutory and Intermediate Decisions

A party may not appeal an interlocutory order unless authorized by statute.

1 Case that cites this headnote

**[19]** **Appeal and Error** ⚬ On motion for dismissal or nonsuit

Statutes do not authorize an interlocutory appeal from an order granting a governmental unit's motion to dismiss third-party claims on non-jurisdictional grounds.

1 Case that cites this headnote

**\*497** ON PETITION FOR REVIEW FROM THE COURT OF APPEALS FOR THE THIRD DISTRICT OF TEXAS, David E. Puryear.

**Attorneys and Law Firms**

Jason D. Ray, Riggs & Ray, P.C, J. Woodfin Jones, Alexander Dubose Jefferson & Townsend LLP, Austin, E. Hart Green, Mitchell A. Toups, Weller Green Toups & Terrell, L.L.P., Beaumont, Richard Bruce Pecore, Liles Parker, PLLC, Kingwood, Robert M. Anderton, Law Offices of Hanna & Anderton, Austin, J. A. (Tony) Canales, Canales & Simonson, P.C., Corpus Christi, for Petitioners.

J. Campbell Barker, Philip A. Lionberger, Raymond C. Winter, Scott A. Keller, Office of the Attorney General of Texas, Jeffrey C. Mateer, First Assistant Attorney General, Christopher R. Cowan, Eric J.R. Nichols, Beck Redden LLP, Austin, David M. Gunn, Constance H. Pfeiffer, William C. Webb, Beck Redden LLP, Houston, Robert C. Walters, Gibson, Dunn & Crutcher LLP, Dallas, for Respondents.

William R. Peterson, Morgan, Lewis & Bockius LLP, Houston, for Amicus Curiae Pharmaceutical Research and Manufacturers of America.

Constance H. Pfeiffer, Beck Redden LLP, Houston, David M. Gunn, Beck Redden LLP, Houston, for Amici Curiae Xerox Corporation, Xerox State Healthcare LLC.

Oscar Xavier Garcia, Attorney at Law, Brownsville, Philip H. Hilder, Hilder & Associates PC, Houston, William Graham, Hilder & Associates, Austin, for Other interested parties.

**Opinion**

Justice Brown delivered the opinion of the Court, in which Chief Justice Hecht, Justice Green, Justice Guzman, and Justice Devine joined.

In this enforcement action under the Texas Medicaid Fraud Prevention Act (the Act), the State of Texas alleges that several dentists and their professional associations and employees (collectively, the Providers) fraudulently obtained Medicaid payments for providing dental and orthodontic treatments to children. In response, the Providers assert counterclaims and third-party claims alleging that the state and its contractor mismanaged the payment-approval process and misled the Providers regarding the requirements that the Texas Medicaid Program (the Program) imposes. The state filed a plea to the jurisdiction against the counterclaims and a motion to dismiss the third-party claims. The trial court granted both. The Providers filed this interlocutory appeal. We conclude that sovereign immunity bars the Providers' counterclaims against the state and that we lack interlocutory jurisdiction to address the trial court's dismissal of the Providers' third-party claims. We affirm the court of appeals' judgment.

**I**

**Background**

The facts giving rise to this dispute depend on whom you ask. According to the state, the Providers voluntarily agreed to participate in the Program by providing **\*498** orthodontic treatments to qualifying children in exchange for payments from the state at reduced Medicaid rates.[1] *See generally* 42 U.S.C. §§ 1396 to 1396w–5 (authorizing each state to administer its own Medicaid program); TEX. HUM. RES. CODE § 32.001 (implementing the Texas Medicaid Program "to provide medical assistance on behalf of needy individuals and to enable the state to obtain all benefits for those persons authorized" by federal law). The Program pays for certain "medically necessary" orthodontic treatments, but it does not cover treatments that are for "cosmetic reasons only." 25 TEX. ADMIN. CODE §§ 33.40(b), 33.71(a). As one way of preventing improper payments, the Program requires dentists and orthodontists to obtain prior authorizations for all services and treatments. *Id.* §

33.71(a). During the events that spurred this litigation, Xerox administered the prior-authorization program under a contract with the state. The state alleges that the Providers routinely submitted prior-authorization and post-treatment-payment requests that misrepresented the severity or nature of the patients' conditions, sought payments for services that were never provided, falsely claimed that licensed employees had provided the services, and in some cases, accepted kickbacks. At the same time, the state alleges, Xerox failed to properly review the Providers' prior-authorization requests and instead simply rubber-stamped them.[2] The state thus maintains that the Providers and Xerox committed independent frauds in violation of the Act, ultimately costing the state "and its taxpayers millions of dollars."

| | |
|---|---|
| 1 | The state's live petition alleges that the Providers fraudulently performed "general dental and/or orthodontic services." The remainder of this opinion refers to these services as "orthodontic services" or "orthodontic treatments." |
| 2 | The state's allegations against Xerox form the core of a separate Medicaid-fraud case, also announced today. *See In re Xerox*, 555 S.W.3d 518, 2018 WL 3077704 (Tex. 2018). |

The Providers tell a different story. They deny knowingly submitting false prior-authorization or payment requests. Instead, they claim their requests and services complied with the Program's requirements as the state and Xerox explained and enforced those requirements. According to the Providers, the state permitted and even intended Xerox to approve as many treatments as possible. This instruction, the Providers say, was part of the state's plan to fend off additional liabilities in a series of long-running federal lawsuits related to allegations that the Program "did not satisfy the requirements of federal law." *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 434, 124 S.Ct. 899, 157 L.Ed.2d 855 (2004); *see also Frazar v. Ladd*, 457 F.3d 432, 434 (5th Cir. 2006) (discussing "the latest chapter in the suit to improve Texas administration of the Medicaid program to afford health care to the certified class of indigent children").

The Providers allege that because the state was desperate to appear compliant with the federal-court orders, the state turned a blind eye to Xerox's routine rubber-stamping of the Providers' requests. This, the Providers say, led them to believe that the information they were submitting complied with the Program's requirements and established that their

patients qualified for orthodontic services. But when reports of the state's exploding expenditures began to emerge, the Providers allege the state blamed them in an effort to avoid responsibility for its own actions, enrich itself, and limit its liability to the federal government for having mismanaged the Program. As a result, the **\*499** Providers say they are not responsible for improper requests, if any, and are not liable for any overpayments. To the contrary, urge the Providers, the state and Xerox are liable for all losses, expenses, and attorney's fees that the Providers have incurred as a result of the state's and Xerox's "scheme."

The state's first step was to initiate administrative actions against various dentists—including the Providers—alleging they fraudulently obtained payments from the Program. An avalanche of legal proceedings involving the state, Xerox, and the Providers ensued. Throughout these proceedings, the state has sought to pursue its claims against Xerox and the Providers separately, while Xerox and the Providers have attempted, unsuccessfully, to join all of the claims in one proceeding. After the administrative-law judges ruled against the state in its administrative actions, the state filed this lawsuit against the Providers.

In this suit, the state alleges that the Providers committed fraud in violation of the Act by submitting false prior-authorization and payment requests, seeking payments for services never rendered, misrepresenting the qualifications of those who provided orthodontic services, and, in some cases, accepting illegal kickbacks. The state argued that the trial court could enjoin the Providers from committing fraud. *See* TEX. HUM. RES. CODE § 36.051(a) (authorizing injunctive relief). It also pleaded in its petition for a recovery "to the maximum extent allowed by law," including specifically:

(1) the amount of any payments provided under the [Program], directly or indirectly, as a result of each [Provider's] unlawful acts,

(2) prejudgment interest on the amount of the payments or the value of such payments,

(3) two times the amount of any payment provided under the [Program], directly or indirectly, as a result of each [Provider's] unlawful acts,

(4) civil penalties, and

(5) expenses, costs, and attorneys' fees.

*See id.* § 36.052 (authorizing civil remedies). The state alleges that each of the Providers is "jointly and severally liable for the damages which arose either directly or indirectly, as a result of each [of the Providers'] unlawful acts."

The Providers filed an answer generally denying the state's allegations. They also asserted counterclaims against the state for conspiracy, breach of contract, and conversion. The Providers seek "proportional recovery of actual and exemplary damages, interest, court costs, and attorney's fees against the State." They allege that the state has waived its sovereign immunity as to the Providers' "connected, germane, and defensive counterclaims" and that it "is liable up to those amounts plead[ed]." The Providers also asserted third-party claims against Xerox, seeking damages and contribution for common-law fraud, breach of contract, promissory estoppel, negligent hiring, negligent supervision, negligence, and gross negligence. They allege the state and Xerox were responsible for authorizing the Providers' services and conspired to rubber-stamp the Providers' authorization and payment requests. The Providers say this conspiracy led them to continue using the same standards to establish medical necessity, making the state and Xerox liable for any payments for services that were not medically necessary.

The state filed a plea to the jurisdiction against the Providers' counterclaims, asserting that sovereign immunity bars the counterclaims and that the Providers lack **\*500** standing to assert any claims under the Act or for breach of the contract between the state and Xerox. The state also filed a motion to dismiss the Providers' third-party claims against Xerox, arguing that the Act does not permit a defendant to assert third-party claims and that sovereign immunity bars such claims against a state contractor acting within the scope of its contractual authority. The trial court granted both motions, expressly holding that "the state is entitled to bring this action against [the Providers] to the exclusion of other parties." The Providers filed an interlocutory appeal, and Xerox filed a brief supporting the Providers' appeal. The court of appeals affirmed the trial court's order dismissing the Providers' counterclaims. 497 S.W.3d 169, 171 (Tex. App.—Austin 2016). The court did not consider the merits of the Providers' appeal from the order dismissing the third-party claims, concluding that it lacked interlocutory jurisdiction over that order. *See id.* at 184.

We granted the Providers' petition for review. We need not and do not address the merits of the parties' claims or pick between

their competing descriptions of the underlying facts. The only issues before us today are: (1) whether sovereign immunity bars the Providers' counterclaims against the state; and (2) whether the trial court erred by dismissing the Providers' third-party claims against Xerox. We conclude that sovereign immunity bars the counterclaims, and we agree with the court of appeals that we lack interlocutory jurisdiction to address the order dismissing the third-party claims.

## II

## Counterclaims

 **[1]**   **[2]**   **[3]**  The trial court dismissed the Providers' counterclaims on the ground that sovereign immunity bars those claims, meaning the court lacked jurisdiction to hear them. The common-law doctrine of sovereign immunity prohibits suits against the state unless the state consents and waives its immunity. *See* *Hall v. McRaven*, 508 S.W.3d 232, 238 (Tex. 2017). Sovereign immunity from suit "implicates a court's subject-matter jurisdiction," *Engelman Irrigation Dist. v. Shields Bros., Inc.*, 514 S.W.3d 746, 755 (Tex. 2017), because it recognizes "the courts' limited authority over the sovereign creating them." *Hall*, 508 S.W.3d at 238 (citing *Brown & Gay Eng'g, Inc. v. Olivares*, 461 S.W.3d 117, 121 (Tex. 2015) ). When it applies, immunity from suit "operates to 'shield the public from the costs and consequences of improvident actions of their governments.' " *Id.* (quoting *Tooke v. City of Mexia*, 197 S.W.3d 325, 332 (Tex. 2006) ).

 **[4]**   **[5]**   **[6]**  Although the state may elect to waive its sovereign immunity, that policy decision belongs largely to the legislature. *See* *Engelman*, 514 S.W.3d at 753. The legislature may waive the state's immunity "by statute or by legislative resolution." *Fed. Sign v. Tex. S. Univ.*, 951 S.W.2d 401, 405 (Tex. 1997), *superseded by statute on other grounds as stated in* *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 224 (Tex. 2004). If the legislature elects to waive immunity, it must do so "by clear and unambiguous language." *Tooke,* 197 S.W.3d at 328–29 (citing TEX. GOV'T CODE § 311.034). In this court, the Providers do not argue that the Act expressly waives the state's immunity against their counterclaims, and we agree

with the state and the court of appeals that it does not. *See* 497 S.W.3d at 175 ("Nothing in the provisions of the Act can be construed as a waiver of immunity for the claims at issue in this case.").

The Providers argue that the attorney general "waived" the state's sovereign immunity **\*501** by filing this suit and voluntarily appearing in court. In support, the Providers rely on cases like *Anderson, Clayton & Co. v. State ex rel. Allred*, in which we held that "where a state voluntarily files a suit and submits its rights for judicial determination, it will be bound thereby, and the defense will be entitled to plead and prove all matters properly defensive." 122 Tex. 530, 62 S.W.2d 107, 110 (1933). "This includes the right," we explained, "to make any defense by answer or cross-complaint germane to the matter in controversy." *Id.* The Providers also cite cases stating, for example, that "[w]hen the state becomes a party to a suit it is subject to the same rules that govern other parties." *Sec. Tr. Co. v. Lipscomb Cty.*, 142 Tex. 572, 180 S.W.2d 151, 159 (1944); *see also* *State v. Naylor*, 466 S.W.3d 783, 792 (Tex. 2015) ("[T]he State must abide by the same rules to which private litigants are beholden."); *Reata Constr. Corp. v. City of Dallas*, 197 S.W.3d 371, 377 (Tex. 2006) ("[T]he City must participate in the litigation process as an ordinary litigant[ ] ...."); *State v. Zanco's Heirs*, 18 Tex.Civ.App. 127, 44 S.W. 527, 529 (San Antonio 1898, writ ref'd) ("When the state of Texas enters its courts as a litigant, it must be held subject to the same rules that govern other litigants[ ] ....").

The state disagrees, relying on cases like *Borden v. Houston* for the rule that the state's appearance as a plaintiff in its own courts does not waive its immunity against counterclaims. *See* 2 Tex. 594, 611–12 (1847) ("When individuals have rights against the government, the clearest principles of equity and justice demand that those rights shall be respected[ ] .... But however clear the right may be, ... it can be enforced against the government only by its consent, and in the manner it may prescribe."). And while the state may be bound to follow certain procedures when it appears in court, the state contends, procedural rules cannot waive the state's immunity.

We agree with the state that these decisions do not establish that the state *waives* its sovereign immunity by initiating suit.

Many of the cases the Providers cite stand simply for the proposition that procedural rules apply to the state just as they would to any other litigant when the state appears in court. That proposition, though sound, does not answer the question whether sovereign immunity protects the state from having to defend certain actions to begin with. *See* *Fed. Sign,* 951 S.W.2d at 407 ("To state what happens *if* the State consents to be sued says nothing about whether the State consents to be sued.").

 **[7]** **[8]** **[9]** And while the quote from *Anderson* appears to support the Providers' waiver argument, we clarified that case and others like it in *Reata Construction Corp. v. City of Dallas*. *See* 197 S.W.3d at 374, 376–77 (citing *Anderson,* 62 S.W.2d at 110). We based our *Reata* holding not on a waiver theory, but on the *scope* of the City's immunity. *See* *id.* at 375 ("[I]t remains the judiciary's responsibility to ... determine under what circumstances sovereign immunity exists in the first instance."). So although we defer to the legislature to determine whether the state has waived immunity, "sovereign immunity is a common-law creation," and the "responsibility to define the boundaries of the doctrine" remains with the judiciary. *Engelman,* 514 S.W.3d at 753. One such boundary is that a governmental entity simply "does not have immunity from suit for monetary claims against it that are 'germane to, connected with, and properly defensive to' affirmative claims made by the entity," to the extent that the claims against the entity offset the entity's own claims. *City of Dallas v. Albert,* 354 S.W.3d 368, 372 (Tex. 2011) (quoting **\*502** *Reata,* 197 S.W.3d at 378). "This is not because the governmental entity 'waives' its immunity by filing a claim for affirmative relief. Instead, the scope of governmental immunity simply does not reach the defensive counterclaims to the extent that any recovery on the counterclaims serves as an 'offset' against the government's recovery." *C. Borunda Holdings, Inc. v. Lake Proctor Irrigation Auth. of Comanche Cty.,* 540 S.W.3d 548, 550 (Tex. 2018) (per curiam) (citations omitted).

At issue here, then, is not whether the state waived its immunity against the Providers' counterclaims by filing this suit, but whether the scope of the state's immunity encompasses those counterclaims to begin with. *See* *Albert,* 354 S.W.3d at 375. We agree with the parties that the principles we announced in *Reata* govern the

resolution of that issue. We explained in *Reata* that once a "governmental entity interjects itself into or chooses to engage in litigation to assert affirmative claims for *monetary damages*, the entity will presumably have made a decision to expend resources to pay litigation costs." 197 S.W.3d at 375 (emphasis added). We also recognized that "it would be fundamentally unfair to allow a governmental entity to assert affirmative claims against a party while claiming it had immunity as to the party's claims against it." *Id.* at 375–76.

To resolve the issue, we must first answer which part of the phrase "monetary damages" best captures *Reata*'s holding: is it the word "monetary," as the Providers argue, or is it the word "damages," as the state argues? *See* *id.* at 375. We conclude that *Reata* applies to damages, but that the question whether it applies further—and how much—is one of first impression. This conclusion gives rise to a second question: does *Reata* apply to penalties? We conclude that it does not. The third question is whether the state's action under the Act seeks to impose a penalty. We answer that question in *Xerox*, also decided today. *See* *Xerox,* 555 S.W.3d at 533–34. In that case, "[c]onstruing the statute as a whole, we conclude Section 36.052 of the [Act] employs a penalty scheme." *Id.* at 534. Since the Act is penal, *Reata*'s abrogation-of-immunity rule does not apply. Accordingly, the state's sovereign immunity protects it from the Providers' counterclaims.

### A

The Providers argue that *Reata* applies broadly: anytime the state seeks a transfer of funds. They contend that we have given "broad application" to the rule waiving sovereign immunity when the state files a suit "in the form of affirmative claims for monetary relief." Thus, the Providers argue, "*Reata* simply does not contemplate or support a distinction between damages and penalties" and "the [court of appeals] was wrong to create one." The Act authorizes (and the state has pleaded for) a monetary award including: (1) the amount of any payment the state made as a result of each unlawful act, (2) prejudgment interest on that amount, (3) a civil penalty for each unlawful act, and (4) two times the amount of any payment made as a result of an unlawful act. *See* TEX. HUM. RES. CODE § 36.052(a). The Providers

argue that although *Reata* happened to involve tort claims for compensatory damages, we did not limit our holding to *only* those types of claims seeking *only* that type of monetary relief. *See, e.g.,* 197 S.W.3d at 376–78 (referring three times to the governmental entity's claims for "monetary relief"); *id.* at 377 ("Once it asserts affirmative claims for *monetary recovery*, the City must participate in the litigation process as an ordinary litigant[ ] ...." (emphasis added) ); *id.* at 375 ("If the opposing party's claims can operate only as an offset to reduce the *government's recovery*, no tax resources **\*503** will be called upon to pay a judgment[ ] ...." (emphasis added) ).

The state responds that *Reata* applies narrowly: only when the state seeks compensatory damages. Since *Reata* referred to the City's claim as "damages," the state says that damages are the only type of relief that *Reata* addressed. *See id.* at 377 ("[The City's decision] to file suit for *damages* encompassed a decision to leave its sphere of immunity from suit for claims against it which are germane to, connected with and properly defensive to claims the City asserts." (emphasis added) ); *id.* ("[T]he trial court acquired subject-matter jurisdiction over claims made against the City which were connected to, germane to, and properly defensive to the matters on which the City based its claim for *damages*." (emphasis added) ); *id.* ("[T]he trial court did not acquire jurisdiction over a claim for *damages* against the City in excess of *damages* sufficient to offset the City's recovery, if any." (emphasis added) ); *id.* ("[T]he City's assertion of claims for *damages* against Reata means that the City does not have immunity from Reata's claims to the limited extent we have explained ...." (emphasis added) ).

We do not agree with either party's characterization of our precedent. In *Reata* and its progeny, we used broad terms like "monetary relief" simply to refer to the damages the government sought. That usage does not establish that *Reata* applies to all money claims, as the Providers suggest. But neither does it expressly limit the *Reata* rule to compensatory damages, as the state suggests. In other words, the issue whether the *Reata* rule covers the facts this case presents is one of first impression.

### 1. Pre-*Reata* decisions

*Reata*'s abrogation analysis cites eight cases, but it discusses only three of them in depth. *See* 197 S.W.3d at 376–77. Two cases appear only once each. *See id.* (first citing *Tex. Nat. Res. Conservation Comm'n v. IT–Davy,* 74 S.W.3d 849, 861 (Tex. 2002) (Hecht, J., concurring) ); and then citing *City of La Porte v. Barfield,* 898 S.W.2d 288, 297 (Tex. 1995), *superseded by statute as stated in Manbeck v. Austin Indep. Sch. Dist.,* 381 S.W.3d 528, 532 (Tex. 2012) (per curiam) ). Three more cases appear only in footnotes. *See id.* at 376–77 nn.2–3. (first citing *Borden,* 2 Tex. at 611; then citing *Bates v. Republic of Texas,* 2 Tex. 616, 618 (1847); and then citing *Sw. Contract Purchase Corp. v. McGee,* 120 Tex. 240, 36 S.W.2d 978, 979 (1931) ). The remaining cases are the three on which *Reata*'s analysis most relied. *See id.* (first discussing *Anderson,* 62 S.W.2d 107; then citing *State v. Humble Oil & Ref. Co.,* 141 Tex. 40, 169 S.W.2d 707 (1943); and then citing *Kinnear v. Tex. Comm'n on Human Rights ex rel. Hale,* 14 S.W.3d 299 (Tex. 2000) (per curiam). None of these cases support the view that *Reata* contemplated abrogating immunity anytime the state sues in its own courts to obtain money.

The first of the three principal cases on which *Reata* relied, *Anderson,* was an enforcement action in which the state sought "recovery of penalties" against a trucking company that was operating without a license. *Anderson,* 62 S.W.2d at 107. Importantly, although the state was seeking a penalty, the counterclaimants in *Anderson* "alleged that the agents of the state were acting unlawfully and in excess of their authority" and "sought an order enjoining such officers from interfering with the operating of the trucks over the highways." *Id.* at 109. That is, the counterclaimants were not seeking monetary relief. *See id.* We held that they could maintain their counterclaim against the state in that case, reasoning that

**\*504** The state having invoked the jurisdiction of the district court ... for a judicial determination of the question as to whether the defendants were ... liable for the penalties ... became subject to the same rules as other litigants, except in so far as such rules may be modified in favor of the state by statute or may be inapplicable or unenforceable because of exemptions inherent in sovereignty.

*Id.* at 110. We concluded that a "state's immunity from suit does not extend to a suit against state officers to enjoin the enforcement of an invalid law." *Id.* We also noted the "further rule" that "where a state voluntarily files a suit and submits its rights for judicial determination, it will be bound thereby, and the defense will be entitled to plead and prove all matters properly defensive." *Id.* Since the counterclaimants in *Anderson* did not even seek any money from the state, that case—although it has figured prominently in subsequent claims for money—establishes little in determining which of the state's suits for money *Reata*'s abrogation rule applies to. If anything, *Anderson*'s reference to the "exemptions inherent in sovereignty" indicates that counterclaims for money are different from counterclaims for injunctive relief. *Id.*

The second case, *State v. Humble Oil & Refining Co.*, involved an operator that overpaid taxes in some months but underpaid them in another. *See* 169 S.W.2d at 708. When the state tried to recover the underpayments, the operator, relying on "the general rule announced in *Anderson*[,]" claimed the overpayments as an offset, and it paid the difference rather than the full tax it owed for the underpaid month. *See* *id.* at 709 (citing *Anderson, 62 S.W.2d at 110*). We rejected the operator's argument:

We have no fault to find with the rule of law announced in the *Anderson,*

*Clayton & Co.* opinion, when applied in a proper case. *It, however, can have no application in this suit, because to here apply it would allow it to abolish the rule that taxes due the State cannot be offset by an indebtedness due by the State to the tax debtor.* Furthermore, here we have no offset claim which is dependent upon, connected with, or grew out of the subject matter of this suit. It is true that the subject matter of this suit is gross production taxes on oil, and the subject matter of the offset claim is the same character of taxes. But the one claim has no connection with the other, and the two claims are entirely independent of each other .... The two claims are not even involved in the same report.

*Id.* at 709–10 (emphasis added). *Humble Oil* thus recognized something that *Anderson* itself did not—that the "rule of law announced" in *Anderson* could apply to some monetary offsets. *Id.* at 709; *see also Anderson, 62 S.W.2d at 110* (allowing a counterclaim for injunctive relief). If the rule were otherwise, the *Humble Oil* court would have had no reason to exempt taxes from *Anderson*'s ambit. Accordingly, one of the first cases recognizing that the *Anderson* rule could apply to money also recognized that the rule did not apply to *all* money. As such, *Humble Oil*, though it predates *Reata*, directly contradicts the proposition that the *Reata* rule applies to all monetary offsets. *See Humble Oil, 169 S.W.2d at 709–10; see also Reata, 197 S.W.3d at 371* (noting approvingly that *Humble Oil* "acknowledged that in *certain circumstances*, a defendant would be entitled to assert a claim against the State" (emphasis added) ).

The third case, *Kinnear v. Texas Commission on Human Rights ex rel. Hale*, addressed a counterclaim for attorney's fees in response to the state's initiation of **\*505** a suit under the Texas Fair Housing Act. *See* 14 S.W.3d at

300. We held that "the jurisdictional question [of immunity from suit] ... was answered when the Commission filed suit." *Id.* Because the state had waived immunity from liability by failing to plead it, we "render[ed] judgment awarding Kinnear his attorney fees and costs" under the Fair Housing Act. *Id.* The state's allegation brought with it a claim for monetary relief, *see* TEX. PROP. CODE § 301.153, but a jury found against the state, and we awarded Kinnear attorney's fees on that basis, *see* 14 S.W.3d at 300. In other words, the attorney's fees in *Kinnear* were not an offset. Thus, *Kinnear* had no reason to cite (and did not cite) *Anderson* or *Humble Oil*. So while *Kinnear* involved an abrogation of immunity, it was not the type of abrogation we announced in *Anderson* and expounded on in *Reata*. As a result, it provides scant reason to conclude anything about *Reata*'s scope.

In sum, of the three cases on which *Reata* grounded its analysis, the first did not even involve a counterclaim for money, *see* *Anderson*, 62 S.W.2d at 110, the second dealt primarily with sovereign immunity *barring* a counterclaim for money in the tax context, *see* *Humble Oil*, 169 S.W.2d at 709–10, and the third *allowed* attorney's fees against the state in response to a failed enforcement action that did not even involve an offset, *see* *Kinnear*, 14 S.W.3d at 300. Against this backdrop, the Providers ask us to conclude that *Reata* applies "without regard to the type of monetary relief" sought.

### 2. *Reata*

In *Reata*, a contractor sued a subcontractor, alleging that the subcontractor negligently drilled into a water main. *See* 197 S.W.3d at 373. The subcontractor filed a third-party claim against the City of Dallas. *See* *id.* Before answering the subcontractor's third-party claim, the City intervened and "assert[ed] claims of negligence against [the subcontractor] *and* a plea to the jurisdiction asserting governmental immunity from suit." *Id.* (emphasis added). That is, the City sought to recover for the subcontractor's negligence, and at the same time maintained that it was

immune from answering for its own negligence. *See* *id.* We announced, in *Reata*'s introductory paragraph, that "the City does not have immunity from suit as to [the subcontractor's] claims which are germane to, connected with, and properly defensive to the City's claims, to the extent [the subcontractor's] claims offset those asserted by the City." *Id.* The remainder of the opinion confirms that our decision regarding the City's claims resulted from the claims' character as *damages* rather than their character as *money*. *See generally* *id.* at 374–77.

First, *Reata* uses the word "damages" more than a dozen times. By contrast, it refers but three times to the City's "recovery," twice to its claims for "monetary relief," and only once to a "monetary recovery." *See* *id.* at 373–78. This usage indicates that we decided the case based on the narrow theory of damages rather than the broad theory of a transfer of funds. *See* *id.* at 375 ("The United States Supreme Court has also recognized that suits for money *damages* against states 'may threaten the financial integrity of the States' and that 'at the time of the founding, many of the States could have been forced into insolvency but for their immunity from private suits for *money damages*.'" (emphasis added) (quoting *Alden v. Maine*, 527 U.S. 706, 750, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999) ). Our purpose in using the broader phrase was benign: avoiding repetition. And to the extent we used "monetary relief" and its variants as something other than synonyms for "damages," our goal was to emphasize **\*506** "*monetary* relief" as opposed to *injunctive* and other types of relief rather than to abrogate the state's sovereign immunity every time it enters a court in pursuit of a money judgment. *See* *id.* at 376–77; *see also* *Hilco Elec. Co-op., Inc. v. Midlothian Butane Gas Co.*, 111 S.W.3d 75, 81 (Tex. 2003) (applying the rule that "when words of a general nature are used in connection with the designation of particular objects or classes ... the meaning of the general words will be restricted to the particular designation").

Second, accepting the interpretation the Providers urge—that *Reata* applies "without regard to the type of monetary relief" sought—would require us to accept that *Reata* overruled *Humble Oil* sub silentio. Because if the *Reata* rule applies to every "monetary recovery," *see* 197 S.W.3d

at 377, then the *Reata* rule applies anytime the state sues to collect taxes. But *Humble Oil* holds precisely the opposite. *See* 169 S.W.2d at 710 ("[T]axes due [to] the State cannot be offset by an indebtedness due by the State to the tax debtor."). Moreover, *Reata* relied heavily on *Humble Oil* as one of "our decisions that ... in effect, modified the common-law immunity doctrine and, to an extent, abrogated immunity of the entity that filed suit." *See* 197 S.W.3d at 377 (first citing *Humble Oil* 169 S.W.2d at 710; and then citing *Anderson,* 62 S.W.2d at 110). Had we intended to overrule *Humble Oil*, we would have done so directly, and we certainly would not have relied on it as one of the three foundational cases supporting the rule we announced. This suggests that the rule we adopted in *Reata* applies to something less than the full spectrum of legal actions the state has at its disposal for effecting a monetary transfer.

Third, if *Reata* abrogated immunity for some class of cases beyond damages, why is "monetary recovery" the limit rather than "recovery" in general or simply "any claim"— monetary or otherwise? *See, e.g.,* 197 S.W.3d at 375–76 ("In this situation, we believe it would be fundamentally unfair to allow a governmental entity to assert *affirmative claims* against a party while claiming it had immunity as to the party's *claims* against it." (emphasis added) ); *id.* at 376 ("[W]hen an *affirmative claim for relief* is filed by a governmental entity, subsequent cases indicate that under such circumstances immunity from suit no longer completely exists for the governmental entity." (emphasis added) ). Since the Providers' interpretation offers no upper limit on *Reata*'s ambit, we decline to adopt it. Though subsequent cases may modify, expand, or clarify its scope, in *Reata* itself the abrogation-of-immunity rule applied only to the City's claim for damages.

Moreover, our decisions following *Reata* also support the conclusion that the *Reata* rule applies to some, though not necessarily all, monetary claims. For example, in *City of Dallas v. Albert*, we characterized our decision in *Reata* as one "conclud[ing] that immunity from suit was abrogated to a *limited* degree." 354 S.W.3d at 379

(emphasis added) (citing *Reata,* 197 S.W.3d at 375–76); *see also Reata,* 197 S.W.3d at 377 ("[T]he City does not have immunity from Reata's claims to the *limited* extent we have explained ...." (emphasis added) ). Similarly, in *City of Galveston v. State*, just one year after *Reata* and *Tooke v. City of Mexia*, we noted that "we recently held in *Reata* ... that immunity does not exist when a government affirmatively files suit for *money damages*." *City of Galveston v. State*, 217 S.W.3d 466, 471 (Tex. 2007) (emphasis added); *see also Manbeck*, 381 S.W.3d at 532 ("In *Reata*[,] ... we held that when a governmental entity asserts an affirmative claim for *monetary damages* against its opponent, [the *Reata* rule applies]." (emphasis added) ).

**\*507** **[10]** These considerations convince us that the state's assertion of a claim for monetary relief, standing by itself, is not enough to trigger *Reata*'s abrogation-of-immunity rule. Said otherwise, the fact that the state seeks a transfer of funds is not *sufficient* to place it beyond the protections that immunity from suit affords. When it asserts an affirmative claim for damages, the state steps outside the sphere of its immunity from suit to the extent we described in *Reata. See* 197 S.W.3d at 375–76. But money is at issue in many more of the state's actions than those in which it seeks damages.

### B

**[11]** **[12]** **[13]** Having concluded that the *Reata* rule does not abrogate sovereign immunity in every suit in which the state seeks a transfer of funds, we must next consider whether the *Reata* rule applies to the action at issue in this case. Contrary to the Providers' argument, we have never held that the *Reata* rule *always* applies when the government seeks any transfer of funds. And contrary to the state's suggestion, nor have we ever held that *Reata* applies *only* to compensatory damages. We hold neither today. Instead, we hold that the *Reata* rule—under which the state, by participating in certain litigation, steps outside the sphere of protection that common-law immunity from suit

provides—*never* applies when the state initiates litigation to enforce a substantive prohibition against unlawful conduct by imposing a monetary penalty. Sovereign immunity protects the state from counterclaims that seek to offset a penalty. Several strands in our jurisprudence support this rule.

 **[14]** **[15]** First, "offsets" are never "germane to, connected with, and properly defensive to" whether a monetary penalty is due. *See* *Reata,* 197 S.W.3d at 377. Penalties are inherently one-sided. Citizens cannot claim a penalty against the state, but the state can and does frequently assess fines, penalties, and sanctions against its citizens. Accordingly, a citizen seeking to offset a penalty must assert some other, non-penal source of the state's liability—a tort, a contract, etc. But in that situation, "one claim has no connection with the other, and the two claims are entirely independent of each other." *See* *Humble Oil,* 169 S.W.2d at 710. Indeed, *Humble Oil* holds that taxes from one month are not "dependent upon[ or] connected with" taxes from another. *Id.* The same is true for penalties. When the state seeks to sanction primary conduct, a properly defensive response is that the conduct never occurred, or that it occurred to some lesser degree than the state alleges—not that the state cannot collect the penalty because the state itself owes some other, non-penal sum.

In their conspiracy and breach-of-contract counterclaims, the Providers contend, essentially, that they should not be liable for their fraud because the state let them get away with it. This argument has nothing to do with whether the Providers violated the Act. They may have strong arguments that they did not, though we express no opinion on that point. Even under *Albert*'s description of *Reata*'s connectedness prong—that a counterclaim is "germane" if it is "relevant to" or "would at least inferentially rebut" the state's claim—the Providers' counterclaims have not connection with whether they violated the Act. *See* *Albert,* 354 S.W.3d at 375–77 (discussing *Reata,* 197 S.W.3d at 377).

Similarly, the Providers' conversion counterclaim cannot meet *Reata*'s requirements. The Providers argue that the state has converted funds by holding money that is earmarked for services "for which [the Providers] should be paid." The problem with this argument is that whether the **\*508** Providers "should be paid" is already one of the central issues in this case. That is, the conversion counterclaim is unavailable under *Reata* because it could never meet *Reata*'s other predicate—offset. *See* 197 S.W.3d at 378. A merits victory for the state would vindicate the state's current payment hold. The held payments would stay with the state, so they could not function as an offset for the Providers. By contrast, a merits victory for the Providers would earn them the held payments. But a win for the Providers would mean that the Providers owe no penalties and so have no judgment to offset. Nor can *Reata* answer whether the Providers *presently* deserve to possess the funds while this litigation unfolds. Offset is a requirement under *Reata*, *see* *id.,* and there will be nothing for the held funds to offset until this litigation concludes in the state's favor (if it does so conclude), at which point the temporary payment hold will no longer be relevant. The state's victory would eliminate the *Reata* hurdle, but it would also conclusively destroy the conversion counterclaim's basis. So regardless of whether the Providers seek a permanent determination that they "should be paid" or a temporary determination that they "should possess the payments" while this suit is ongoing, *Reata* does not help them.

Second, safeguarding the treasury is one of sovereign immunity's primary justifications in the modern era. *See, e.g.,* *Tex. Dep't of Transp. v. Sefzik,* 355 S.W.3d 618, 621 (Tex. 2011) (per curiam) ("[T]he doctrine of sovereign immunity originated to protect the public fisc from unforeseen expenditures that could hamper governmental functions ...."); *City of El Paso v. Heinrich,* 284 S.W.3d 366, 375 (Tex. 2009) ("Th[e] compromise between prospective and retroactive relief[ ] .... comports with the modern justification for immunity: protecting the public fisc."); *Tooke,* 197 S.W.3d at 332 (sovereign immunity "shield[s] the public from the costs and consequences of improvident actions of their governments"); *IT–Davy,* 74 S.W.3d at 854 ("Subjecting the government to liability may hamper governmental functions by shifting tax resources away from their intended purposes toward defending lawsuits and paying judgments.").

Many state programs and offices—including Medicaid, police departments, environmental agencies, etc.—depend at least in part for their continued existence on collecting revenue in the form of penalties. Hampering these entities' collections by abrogating their sovereign immunity injures the public fisc just as surely as allowing private citizens to sue

them directly for damages. For example, under the Providers' view of *Reata*, any driver could assert a "selective enforcement" counterclaim to any speeding ticket. The driver could argue, as the Providers do here, that he thought his conduct was permissible because it went unpunished for several years. The driver might even argue that the police department and, for example, a toll-road operator, conspired to trick the driver into speeding as part of a scheme to boost tolls. Of course, such arguments would not be relevant to whether the offensive conduct actually occurred. But they would, if sovereign immunity did not protect governmental entities from their assertion, dramatically reduce entities' ability to collect revenue. That is why, in an analogous case, we recognized "the rule that taxes due [to] the State cannot be offset by an indebtedness due by the State to the tax debtor." *Humble Oil*, 169 S.W.2d at 710.

Third, sovereignty itself remains an important justification for sovereign immunity. *See Hosner v. DeYoung*, 1 Tex. 764, 769 (1847) ("[M]andamus is not a process that can be resorted to against the state without its consent, and ... no state can be **\*509** sued in her own courts without her consent, and then only in the manner indicated by that consent."); *see also Fed. Sign*, 951 S.W.2d at 411 ("The State's immunity to suit is, purely as a matter of sovereignty, impervious to due process concerns."); *Herring v. Houston Nat'l Exch. Bank*, 114 Tex. 394, 269 S.W. 1031, 1032 (1925) ("[Immunity] is an attribute of sovereignty[ ] ....."). Penalties serve a law-enforcement function and the indiscriminate assertion of spurious counterclaims would severely undermine their effectiveness. Because such counterclaims would interfere with the state's ability to enforce its laws, we decline to abrogate the sovereign immunity that protects the state from their assertion.

[16] A penalty cannot be offset against the state any more than a prison sentence. Because applying the *Reata* rule to penalties would run counter to *Reata* itself and would thwart the primary justifications underlying sovereign immunity's very existence, we conclude that the rule never applies to offset a penalty.

**C**

The Providers argue that even if *Reata* does not apply to penalties—or even if it applies only to damages—it applies in this case because the state is seeking damages, at least in part. The state responds that this proceeding is a "law-enforcement action" in which the state is seeking statutory "sanctions" or "penalties," or perhaps "liquidated damages" (as opposed to compensatory damages). Although some of the Act's penalties must be calculated with reference to the underlying fraud's monetary amount, *see Xerox*, 555 S.W.3d at 526, the state argues that the legislature is free to choose whatever measure of penalty it sees fit. That is, the state argues that the legislature can penalize for monetary losses just as it can for other infractions. The court of appeals agreed with the state, concluding that "the civil penalties that the state is seeking against the [Providers] do not qualify as *damages* or *monetary relief* as those terms were used in *Reata*." 497 S.W.3d at 181. Instead, that court said, the state sued for a civil penalty to "punish" the Providers for violating a public-welfare statute and to deter others from doing the same. *Id.* at 179.

Our decision in *In re Xerox*, also announced today, conclusively rebuts the Providers' argument. *See* 555 S.W.3d at 521–22. We begin the relevant analysis with the observations that "Medicaid fraud exacts an immense toll from the system, not all of which is discoverable, recoverable, or quantifiable as damages" and that "[t]he civil remedy in Section 36.052(a) is undeniably punitive in the aggregate." *See id.* at 527. We also examine the amounts that the Act imposes in subsections 36.052(a)(1), (2), (3), and (4), in each instance observing that the amount is penal rather than compensatory. *See id.* at 525. Finally, we conclude that "Section 36.052 of the [Act] employs a penalty scheme and is not an 'action for the recovery of damages' to which [Texas Civil Practice and Remedies Code] Chapter 33's proportionate-responsibility mandate applies." *Id.* at 534.

Section 36.052 is penal for purposes of chapter 33 because the Act "employs a penalty scheme." *See id.* at 534. Our damages discussion in *Xerox* turns on the Act, not on chapter 33. *See id.* at 539. As a result, section 36.052 is penal for purposes of the chapter 33 analysis in *Xerox* as well as for the *Reata* analysis in this case. It would make little sense for the word "damages" to mean one thing in the proportionate-liability context and another in the sovereign-immunity context. And since *Xerox* depends on the Act rather than on some other statute, our conclusion in that case **\*510** governs the outcome in this one. *See id.* at 539.

*Reata*'s abrogation-of-immunity rule does not apply when the state seeks to impose a monetary penalty to enforce a substantive prohibition against unlawful conduct. Since the state's action is punitive rather than compensatory, *see id.* at 527, the *Reata* rule does not apply here. Accordingly, we need not address the state's contentions that it is not suing as an ordinary litigant or that the Providers' counterclaims fail *Reata*'s "connectedness" prong. Because it is neither waived nor abrogated, sovereign immunity bars the Providers from asserting their counterclaims against the state.

## III

### Third–Party Claims

 **[17]** **[18]** Finally, the Providers also complain that the trial court erred by dismissing their third-party claims against Xerox. The court of appeals refused to address this complaint, concluding that it lacked jurisdiction to consider the issue on interlocutory appeal. *See* 497 S.W.3d at 182–84. We agree with the court of appeals. The trial court's order dismissing the third-party claim was an interlocutory order, and "[a] party may not appeal an interlocutory order unless authorized by statute." *Bally Total Fitness Corp. v. Jackson*, 53 S.W.3d 352, 352 (Tex. 2001). The legislature has authorized interlocutory appeals from an order granting or denying a governmental unit's challenge to the trial court's jurisdiction. *See* TEX. CIV. PRAC. & REM. CODE § 51.014(a)(8). But the state moved to dismiss the Providers' third-party claims against Xerox on the ground that the Act does not permit third-party claims.

 **[19]** Texas statutes do not authorize an interlocutory appeal from an order granting a governmental unit's motion to dismiss third-party claims on non-jurisdictional grounds. We do not address the merits of the Providers' third-party claims or whether those claims are permissible in this action. We simply agree with the court of appeals that we lack interlocutory jurisdiction to address those issues.

\* \* \*

In 1847, this Court decided a trio of cases recognizing the fundamental principle that "[c]oercion ... is incompatible with sovereignty." *Borden*, 2 Tex. at 611; *see also Hosner*, 1 Tex. at 769; *Bates*, 2 Tex. at 617–18. Then, as now, we acknowledged that "[t]here may have occurred in the opinions some unguarded expressions in relation to the equitable rights of the defendants, and powers of the courts, on the subject of set-off against the government." *Bates*, 2 Tex. at 617. And then, as now, we were vigilant to prevent artful advocacy from reducing sovereign immunity to a nullity. There are some monetary actions for which no monetary setoff can be available. Penalties are among them. Accordingly, we affirm the court of appeals' judgment.

Justice Lehrmann filed an opinion concurring in part and dissenting in part, in which Justice Johnson joined.

Justice Boyd and Justice Blacklock did not participate in the decision.

Justice Lehrmann, joined by Justice Johnson, concurring in part and dissenting in part.

> When a state appears as a party to a suit, she voluntarily casts off the robes of her sovereignty, and stands before the bar of a court of her own creation in the same attitude as an individual litigant; and her rights are determined and fixed by the same principles of law and **\*511** equity, and a judgment for or against her must be given the same effect as would have been given it had it been rendered in a case between private individuals. [1]

[1] *State v. Cloudt*, 84 S.W. 415, 416 (Tex. Civ. App. 1904, writ ref'd).

Over a decade ago, we considered "whether sovereign immunity continues to exist when an affirmative claim for relief is filed by a governmental entity." *Reata Constr. Corp. v. City of Dallas*, 197 S.W.3d 371, 376 (Tex. 2006). We determined that "under such circumstances immunity from suit no longer completely exists for the governmental

entity." *Id.* (citing *State v. Humble Oil & Ref. Co.*, 141 Tex. 40, 169 S.W.2d 707, 708 (1943) ). This is because our modern jurisprudence rejects the "antiquated 'feudal fiction' " that the government can do no wrong. *Brown & Gay Eng'g, Inc. v. Olivares*, 461 S.W.3d 117, 121 (Tex. 2015) (quoting *Wichita Falls State Hosp. v. Taylor*, 106 S.W.3d 692, 695 (Tex. 2003) ). Rather, "modern-day justifications" for immunity "revolve around protecting the public treasury." *Id.* Consistent with these policies, we have narrowed the doctrine's scope in circumstances where "the governmental entity has joined into the litigation process by asserting its own affirmative claims for monetary relief," *Reata*, 197 S.W.3d at 376, because it would be "fundamentally unfair to allow [a governmental entity] to assert affirmative claims against [a] party while claiming immunity" as to the party's claims against it, *City of Dallas v. Albert*, 354 S.W.3d 368, 379 (Tex. 2011).

In this case, the State filed suit under the Texas Medicaid Fraud Prevention Act (Medicaid Fraud Act or Act), alleging that the defendants, several dental providers offering services through the Texas Medicaid program, fraudulently obtained Medicaid reimbursements. In filing suit, the State sought to recover any payments unlawfully provided under the Medicaid program; prejudgment interest; two times the amount of any payment provided under the Medicaid program; civil penalties; and expenses, costs, and attorney's fees, as provided by the Act's "civil remedies" provision. *See* TEX. HUM. RES. CODE § 36.052(a). The Providers counterclaimed for breach of contract, conversion, and fraud. The issue before the Court is whether sovereign immunity bars the Providers' counterclaims. Because the State seeks "monetary relief" under *Reata*, I would hold that the State's decision to file this action "encompassed a decision to leave its sphere of immunity from suit." *Reata*, 197 S.W.3d at 377. Because the Court holds otherwise, I must respectfully express my dissent.[2]

[2] For the reasons the Court explains, I agree that we lack interlocutory jurisdiction to address the dismissal of the Providers' third-party claims.

## I. Background

In 1993, the mothers of children in low-income families sued the Texas Department of Health and the Texas Health and Human Services Commission under 42 U.S.C. § 1983, alleging that the Texas Medicaid program did not comply with federal law.[3] The plaintiffs, a class of more than 1.5 million indigent children in Texas, claimed that "the Texas program did not ensure eligible children would receive health, dental, vision, and hearing screens," "failed to meet annual participation goals," and "lacked proper case management and corrective procedures."[4] **\*512** The State ultimately agreed to settle the dispute by entering into a consent decree, which required the State, among other things, "to conduct outreach efforts aimed at increasing participation and the receipt of needed services" for Medicaid-eligible children.[5] After years of litigation, in 2007 the State began allocating millions of dollars in state and federal funding to provide these increased services, including Medicaid dental services.[6]

[3] *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 434, 124 S.Ct. 899, 157 L.Ed.2d 855 (2004).

[4] *Frew v. Gilbert*, 109 F.Supp.2d 579, 587 (E.D. Tex. 2000), *vacated sub nom. Frazar v. Gilbert*, 300 F.3d 530 (5th Cir. 2002), *rev'd sub nom. Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 124 S.Ct. 899, 157 L.Ed.2d 855 (2004).

[5] *Id.* at 588–89.

[6] *See* Act of May 25, 2007, 80th Leg., R.S., ch. 1429, § 19, 2007 Tex. Gen. Laws 5834, 5838–39.

However well-intended, these efforts attracted the scrutiny of Texas news media, and a Dallas news station reported a series of stories highlighting the State's high expenditures for dental and orthodontic services.[7] The Health and Human Services Commission, through its Office of Inspector General, subsequently attributed the high expenditures to dental fraud. The Commission imposed payment holds against various dental providers, including some of the Providers in this case.[8] Following administrative hearings,[9] the SOAH administrative law judges found that the State had failed to present prima facie evidence to support its fraud allegations and ruled that the payment holds should be reversed.[10] But the Commission refused to release the

funds, in one case "alter[ing] the ALJs' findings of fact and conclusions of law and issu[ing] a final order sustaining the HHSC–OIG's payment hold."[11]

7     *See, e.g.,* Byron Harris, *Crooked Teeth: Medicaid Millions*, WFAA (Jan. 9, 2012 1:10 PM CST), http://www.wfaa.com/news/local/investigates/crooked-teeth-medicaid-millions_20161017055833341/336726628.

8     *See Tex. Health & Human Servs. Comm'n v. Antoine Dental Ctr.*, 487 S.W.3d 776, 777–78 (Tex. App.—Texarkana 2016, no pet.); 🚩*Janek v. Harlingen Family Dentistry, P.C.*, 451 S.W.3d 97, 99 (Tex. App.—Austin 2014, pet. denied).

9     A provider subject to a payment hold, which the Commission may impose without prior notice on a provider's Medicaid reimbursements upon a credible allegation of provider fraud, may request an expedited administrative hearing before the State Office of Administrative Hearings. *Shamrock Psychiatric Clinic, P.A. v. Tex. Dep't of Health & Human Servs.*, 540 S.W.3d 553, 555 (Tex. 2018) (citing TEX. GOV'T CODE § 531.102(g)(2), (3) ).

10     *Antoine Dental Ctr.*, 487 S.W.3d at 778, 789; 🚩*Harlingen Family Dentistry*, 451 S.W.3d at 102.

11     *Antoine Dental Ctr.*, 487 S.W.3d at 778, 791 ("Subsequently, [the HHSC Executive Commissioner] entered a final order on May 2, 2014, which also rejected the ALJs' decision. The order was presumably made under authority of Section 357.483 of the Texas Administrative Code, which states, 'The judge is a designee of the HHSC Executive Commissioner for purposes of: (1) issuing default, final, and other orders, and (2) ruling on any motions for rehearing.' ").

The Providers filed suit, challenging the Commissioner's authority to continue holding the funds.[12] The trial courts agreed with the Providers, in one case reversing the final order sustaining the payment hold and, in another, issuing a writ of mandamus commanding the State to pay the improperly held funds.[13] The courts of appeals affirmed the trial courts' judgments in the payment-hold proceedings, ordering the State to release the held funds.[14] The State nonsuited the

administrative **\*513** cases and did not release the withheld funds to the Providers.

12     *Id.* at 778; 🚩*Harlingen Family Dentistry*, 451 S.W.3d at 99.

13     🚩*Harlingen Family Dentistry*, 451 S.W.3d at 104; *Antoine Dental Ctr.*, 487 S.W.3d at 802.

14     🚩*Harlingen Family Dentistry*, 451 S.W.3d at 104 ("There is no evidence that is credible, reliable, or verifying, or that has indicia of reliability, that [the providers] committed fraud or misrepresentation."); *Antoine Dental Ctr.*, 487 S.W.3d at 802.

The State filed the instant suit under the Medicaid Fraud Act, pursuing the same allegations at issue in the nonsuited administrative cases.[15] The Providers responded with counterclaims for "proportional recovery of actual and exemplary damages, interest, court costs, and attorney fees against the State" for conspiracy and breach of contract, in addition to a demand that the State release the monies held as ordered by the administrative law judges, trial courts, and courts of appeals in the nonsuited administrative proceedings. The State invoked sovereign immunity in a plea to the jurisdiction.

15     The State also filed a separate suit against Xerox Corporation, the private contractor charged with administering the Texas Medicaid program and assessing the medical necessity of providers' reimbursement claims, for violations of the Medicaid Fraud Act. *See State v. Xerox Corp.*, No. D–1–GV–14–000581 (53rd Dist. Ct., Travis County, Tex. May 9, 2014).

The trial court granted the State's plea without stating its reasons. The court of appeals affirmed, holding that the 🚩*Reata* rule did not apply because (1) "the civil penalties that the State is seeking against the Dental Groups do not qualify as damages or monetary relief as those terms were used in 🚩*Reata*," and (2) "when the State pursues an enforcement action under the [Medicaid Fraud Act], it is not acting as an ordinary or private litigant as described in 🚩*Reata* but is instead acting in its sovereign capacity and

exercising its police powers." 497 S.W.3d 169, 181 (Tex. App.—Austin 2016) (emphasis removed).

## II. Analysis

The Providers contend that this case fits perfectly within our Reata holding: because the State asserted affirmative claims for monetary relief against the Providers, it does not have immunity against the Providers' offsetting counterclaims, which are connected, germane, and properly defensive to the State's claims. The State disagrees, arguing that in this Medicaid fraud (or any other) enforcement action, (1) the State does not seek the type of "monetary relief" we addressed in Reata, (2) the State does not appear as an "ordinary litigant," and (3) the defendants' counterclaims are not and cannot be connected, germane, and properly defensive to the State's claims. The Court sides with the State, holding that "the Reata rule ... *never* applies when the state initiates litigation to enforce a substantive prohibition against unlawful conduct by imposing a monetary penalty." *Ante* at 507. And, relying on our decision today in *In re Xerox*, 555 S.W.3d 518, 2018 WL 3077704 (Tex. 2018), the Court holds that because the Medicaid Fraud Act "employs a penalty scheme," the Act's civil remedies provision constitutes a monetary penalty and thus may not be offset. *Ante* at 502. I find the Court's analysis unpersuasive.

### A. Judicial Abrogation of Immunity

In analyzing the reach of sovereign immunity, we must engage in a careful weighing analysis and consider the policy issues at hand. *See, e.g.,* Olivares, 461 S.W.3d at 123 ("Guiding our analysis of whether to extend sovereign immunity ... is whether doing so comports with and furthers the legitimate purposes that justify this otherwise harsh doctrine."). These policy considerations led us to permit offsetting counterclaims against the government because: "(1) 'when the State sues a private party, the general public stands to **\*514** lose nothing'; (2) doing so avoids 'jurisdictional problems in asking courts to enforce a judgment against a government entity'; and (3) allowing such [claims] promotes 'fundamental fairness.' " *C. Borunda Holdings, Inc. v. Lake Proctor Irrigation Auth. of Comanche Cty.*, 540 S.W.3d 548, 552 (Tex. 2018) (quoting City of Galveston v. State, 217

S.W.3d 466, 472 (Tex. 2007) ). Properly applying these principles, I would hold that Reata, its predecessors, and its progeny dictate that the State's claims under the Medicaid Fraud Act constitute affirmative claims for monetary relief; the Providers' counterclaims are germane, connected, and defensive to those claims; and allowing the Providers to offset the State's recovery with their counterclaims comports with the policies underlying immunity.

### B. Reata's Scope

In Reata, the City of Dallas intervened in a pending tort action and asserted claims that the city's contractor and its subcontractor negligently caused the city damages when the subcontractor accidentally drilled through a water main. 197 S.W.3d at 373. The State distinguishes Reata, noting that, in this case, the State is not seeking compensatory damages under a conventional tort theory. Instead, the State contends, although this is a civil case, it is a "law-enforcement action" seeking statutory "sanctions" or "penalties," or perhaps "liquidated damages" (as opposed to compensatory damages), which are not based or calculated on the amount of damages or losses the State suffered as a result of the Providers' fraud.

The court of appeals agreed, concluding that the State sued for a "civil penalty" to "punish" the Providers for violating a public-welfare statute and to deter others from doing the same. 497 S.W.3d at 179. The court of appeals primarily relied on State v. Emeritus Corp., 466 S.W.3d 233 (Tex. App.—Corpus Christi 2015, pet. denied), in which the court held that the Texas Medical Liability Act did not apply to the State's enforcement action against a healthcare provider because the State was acting "in its sovereign capacity and us[ing] its police powers to impose and recover a civil penalty," rather than as a "claimant" seeking "damages." 497 S.W.3d at 179–80. The court of appeals here concluded that "the civil penalties that the State is seeking against the Dental Groups do not qualify as *damages* or *monetary relief* as those terms were used in Reata." Id. at 181.

The Providers argue that the court of appeals erred in that conclusion because, other than its claim for an injunction, all of the State's claims in this suit are for "monetary relief."

Specifically, the Medicaid Fraud Act authorizes, and the State requests in its pleadings, a monetary award including (1) the "amount of any payment" the State made "as a result of" each "unlawful act"; (2) prejudgment interest on that amount; (3) a "civil penalty" for each unlawful act; and (4) two times "the amount of any payment" made as a result of an unlawful act. *See* TEX. HUM. RES. CODE § 36.052(a). The Providers argue that, although *Reata* happened to involve tort claims for compensatory damages, our holding was not limited to those types of claims seeking that type of monetary relief. The court of appeals thus created a "distinction that *Reata* neither contemplates nor supports."

I agree with the Providers. The Court superficially states that "*Reata* uses the word 'damages' more than a dozen times," concluding that "[t]his usage indicates that we decided the case based on the narrow theory of damages rather than the broad theory of a transfer of funds." *Ante* at 505. Admittedly, a word search for the term **\*515** "damages" reveals that we used the word thirteen times throughout the opinion, but the majority of the references are not relevant to the issue before us. [16] As relevant to the Court's analysis, we referred to the City's claim for "damages" four times in *Reata*, noting that the City had sued for damages and reasoning that the City's decision "to file suit for damages encompassed a decision to leave its sphere of immunity from suit for claims against it which are germane to, connected with and properly defensive to claims the City asserts"; that sovereign immunity did not apply to the subcontractor's counterclaims "made against the City which were connected to, germane to, and properly defensive to the matters on which the City based its claim for damages"; and that "the City's assertion of claims for damages against Reata means that the City does not have immunity from Reata's claims to the limited extent we have explained." 197 S.W.3d at 377. We referred once to "monetary damages," reasoning that, "if the governmental entity interjects itself into or chooses to engage in litigation to assert affirmative claims for monetary damages, the entity will presumably have made a decision to expend resources to pay litigation costs." *Id.* at 375.

16   For example, two of the references appear in a discussion of the United States Supreme Court's sovereign immunity jurisprudence. *Reata*, 197 S.W.3d at 375 ("The United States Supreme Court has also recognized that suits for money damages

against states 'may threaten the financial integrity of the States' and that 'at the time of the founding, many of the States could have been forced into insolvency but for their immunity from private suits for money damages.' " (quoting *Alden v. Maine*, 527 U.S. 706, 750, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999) ) ). One reference is contained in a recitation of our often-repeated principle that "[s]overeign immunity protects the State from lawsuits for money damages." *Id.* at 374. Similarly, two references describe the relief sought by the private party, not the State. *Id.* at 377 ("Absent the Legislature's waiver of the City's immunity from suit, however, the trial court did not acquire jurisdiction over [the defendants'] claim for damages against the City in excess of damages sufficient to offset the City's recovery, if any."). And four of the references appear under the Court's analysis of waiver of immunity under the Texas Tort Claims Act, which is wholly separate from the abrogation issue. *Id.* at 377–78.

But our discussion and our holding in *Reata* utilized much broader terms. Addressing not just the City's claims but the principles underlying our holding, we referred twice to claims for "monetary relief." First, we reasoned that "where the governmental entity has joined into the litigation process by asserting its own affirmative claims for monetary relief, we see no ill befalling the governmental entity or hampering of its governmental functions by allowing adverse parties to assert, as an offset, claims germane to, connected with, and properly defensive to those asserted by the governmental entity." *Id.* at 376–77. Second, we held that because "the City asserted affirmative claims for monetary relief against Reata, the City does not have immunity from Reata's claims germane to, connected to, and properly defensive to claims asserted by the City, to the extent any recovery on those claims will offset any recovery by the City from Reata." *Id.* at 378. We referred once to "monetary recovery," explaining that, once the government "asserts affirmative claims for monetary recovery, the City must participate in the litigation process as an ordinary litigant." *Id.* at 377. And, most broadly, we referred three times simply to the government's "recovery." We reasoned that our holding would not disrupt the government's fiscal planning if "the opposing party's claims can operate only as an offset to reduce

the government's recovery." *Id.* at 375. We further held that **\*516** immunity would still preclude jurisdiction over any counterclaim "for damages against the City in excess of damages sufficient to offset the City's recovery." *Id.* at 377. Finally, we concluded that the City did not have immunity "to the extent any recovery on [the counterclaims] will offset any recovery by the City from Reata." *Id.* at 378.

We have since characterized *Reata*'s holding by using the broader terms, explaining that governmental entities "do not have immunity from offsetting claims germane to, connected to, and properly defensive to *monetary claims* by the entities." *Albert,* 354 S.W.3d at 376 (emphasis added). [17] And more recently, we described *Reata* as holding that "when a governmental entity asserts claims for *monetary relief,* immunity does not protect the entity against the defendant's counterclaims for monetary relief that are 'germane to, connected with, and properly defensive to' the government's claims." *Borunda,* 540 S.W.3d at 549–50 (emphasis added) (quoting *Reata,* 197 S.W.3d at 376–77). In both of these cases, we described *Reata*'s holding as broadly addressing the State's claims for monetary "recovery."

[17]     *See also* *City of Dallas v. Martin,* 361 S.W.3d 560, 561 n.4 (Tex. 2011) ("In *Reata* we held that a governmental entity does not have immunity from monetary claims against it that are 'germane to, connected with, and properly defensive to' affirmative claims made by the entity, to the extent the claims against the entity offset the entity's claims."); *City of Irving v. Inform Constr., Inc.*, 201 S.W.3d 693, 694 (Tex. 2006) ("As we explained in *Reata*, however, the City retains immunity from suit ... to the extent Inform's damages exceed amounts offsetting the City's monetary recovery.").

Accordingly, I agree with the Providers that the language we used in *Reata* did not limit our analysis or our holding to government claims for "compensatory damages," but instead rested more broadly on the government's claims seeking a "monetary recovery." However, as the Court observes, *Reata* involved only claims for compensatory damages, and neither *Reata* nor any of our subsequent cases specifically address the distinction between the broader and narrower terms. In other words, this is an issue of first impression, and it may just be, as the State and the Court suggest, that we used the broader terms merely as convenient references to the compensatory-damage relief the government was seeking in those cases, rather than to limit the State's immunity when it seeks any form of monetary recovery. I would reject that suggestion, however, primarily for two reasons.

First, although *Reata* involved only claims for compensatory damages, the cases on which we relied to support our holding in *Reata* did not. *Anderson, Clayton & Co. v. State,* the case that provided the foundation for our *Reata* holding, was an enforcement action in which the State sought "recovery of penalties" against a trucking company operating without a license. 122 Tex. 530, 62 S.W.2d 107, 107 (1933). We held that the defendant could maintain a counterclaim against the State in that case, reasoning that the State,

> having invoked the jurisdiction of the district court ... for a judicial determination of the question as to whether the defendants were subject to the provisions of the foregoing act and liable for *the penalties* described therein, it became subject to the same rules as other litigants, except in so far as such rules may be modified in favor of the state by statute or may be inapplicable or unenforceable because of exemptions inherent in sovereignty .... That court at the instance of the state acquired jurisdiction of the parties and subject-matter in controversy, and, the defendants having **\*517** sought affirmative relief in a cross-bill, the jurisdiction of the court cannot afterwards be defeated by the state upon a plea that the cross-petitioners were seeking an injunction against the enforcement of a penal statute.

*Id.* at 110 (emphasis added). The Court attempts to limit *Anderson, Clayton*, reasoning that although the State sought "recovery of penalties," the defendants sought only an injunction, not money damages, in their counterclaim. *Ante* at 503. But the Court gives short shrift to our language in that case. In determining that sovereign immunity did not bar the defendants' counterclaims, we identified two guiding rules:

> The authorities sustain the exception to the foregoing rule that the state's immunity from suit does not extend to a suit against state officers to enjoin the enforcement of an invalid law to the injury of the legal rights of a citizen.

> But the authorities sustain the *further rule* that, where a state voluntarily files a suit and submits its rights for judicial determination, it will be bound thereby, and the defense will be entitled to plead and prove *all matters* properly defensive. This includes the right to make *any defense* by answer or cross-complaint germane to the matter in controversy.

*Anderson, Clayton & Co.*, 62 S.W.2d at 110 (citations omitted) (emphases added). Dismissing the "rule" that a defendant is entitled to plead and prove *all matters* properly defensive, the Court concludes that the decision "establishes little" in resolving this case. *Ante* at 504. In addition to sidestepping that language, the Court ignores the fact that in *Anderson, Clayton* we expressly rejected the argument that the State's immunity could hinge on the "penal" nature of the statute being enforced, 62 S.W.2d at 108, a justification the Court relies on today. Further, the Court's reliance on the nature of the relief requested in the *counterclaims* is novel and misplaced. So long as the counterclaims are germane, connected, and properly defensive to the government's claims and do not seek more than is required to offset those claims, they are permitted under *Reata*, 197 S.W.3d at 377.

In *Reata*, we also relied on our decision in *Humble Oil*, which involved the State's action to recover unpaid production taxes "plus interest and *penalties*." 169 S.W.2d at 708 (emphasis added). We held in *Humble Oil* that the defendant could not assert offsetting counterclaims based on alleged overpayments in other tax periods. *Id.* at 710. However, contrary to the Court's description, we did not base that holding on the nature of the State's affirmative claims.

Rather, *Humble Oil*'s result rested on the fact that the defendant's counterclaims involved taxes due for different months and years than the taxes on which the State had sued, and thus the counterclaims were not "dependent upon" or "connected with" the State's affirmative claims. *Id.* Moreover, we affirmed that we had "no fault to find with the rule of law announced in the *Anderson, Clayton & Co.* opinion, when applied in a proper case." *Id.* at 709. Because we based our decision in *Reata* on these seminal cases, it is no surprise that we referred broadly to government claims for "monetary relief" and "monetary recovery" in *Reata*, even though *Reata* itself involved only claims for compensatory damages.

Consistent with my reading of *Reata*'s scope, several courts of appeals have applied *Reata* in cases involving government claims for monetary relief other than compensatory damages, including penalties, yet the Court neither cites, discusses, nor overrules those cases. For example, in *Bandera County v. Hollingsworth*, the San Antonio Court of Appeals held the County was not immune from a counterclaim for **\*518** breach of a Rule 11 agreement where the underlying suit involved the State's claim for "taxes due, together with interest, penalties, costs, expenses, and attorney's fees." 419 S.W.3d 639, 642–44 (Tex. App.—San Antonio 2013, no pet.). Similarly, in *Redburn v. Garrett*, the City brought, among other claims, "an enforcement action for statutory penalties in the amount of $5,000 per day pursuant to Chapter 54 of the Texas Local Government Code." No. 13-12-00215-CV, 2013 WL 2149699, at \*2 (Tex. App.—Corpus Christi, May 16, 2013, pet. denied) (mem. op.). Despite the inclusion of penalties in the monetary relief sought, the Corpus Christi Court of Appeals applied *Reata*, holding that the City did "not have immunity from suit for claims germane to, connected with, and properly defensive to its [cross-claims] to the extent [appellant's] claims act as an offset against the City's recovery." *Id.* at \*10 (quoting *Inform Constr.*, 201 S.W.3d at 694). And in *City of Conroe v. TPProperty LLC*, the city sought judgment against the defendant for "unpaid taxes, and statutory penalties, attorneys' fees, and court costs." 480 S.W.3d 545, 564 (Tex. App.—Beaumont 2015, no pet.). Without distinguishing between any of these forms of monetary recovery, the Beaumont Court of Appeals

compared the city's and the defendant's claims, concluding that they "arise from the same transactions" and "rely on the trial court's resolution of similar disputed facts." *Id.* Accordingly, the Court held that the city was not immune to the extent the defendant's "claims act as offsets to the City's [claims]." *Id.* (citing *Reata, 197 S.W.3d at 376–77*). As these cases illustrate, nothing in the language of *Reata*, its predecessors, or its progeny indicates that the *Reata* rule applies only when the government seeks to recover "damages" or "compensatory damages."

In addition to the absence of language in *Reata* and its predecessors indicating that the type of monetary recovery sought informs the offset analysis, the policies underlying the sovereign-immunity doctrine do not support the limitation the Court adopts. Consistent with our holdings in *Anderson, Clayton* and other earlier cases, we explained in *Reata* that our "determination that a governmental entity's immunity from suit does not extend to a situation where the entity has filed suit is consistent with the policy issues involved with immunity." *197 S.W.3d at 375*. And "the primary concern in *Reata* was ensuring that any outcome in favor of a counterclaiming defendant would not be paid with taxpayer dollars." *Borunda, 540 S.W.3d at 552*. That is because the purpose of sovereign immunity is to "shield the public from the costs and consequences of improvident actions of their governments." *Hall v. McRaven, 508 S.W.3d 232, 238 (Tex. 2017)* (quoting *Tooke v. City of Mexia, 197 S.W.3d 325, 332 (Tex. 2006)* ); *see also Olivares, 461 S.W.3d at 123* (considering "the general purpose of protecting the public fisc"). We thus limited the scope of immunity when the government files claims for monetary relief because, "if the governmental entity interjects itself into or chooses to engage in litigation to assert affirmative claims for monetary damages, the entity will presumably have made a decision to expend resources to pay litigation costs." *Reata, 197 S.W.3d at 375*. And if "the opposing party's claims can operate only as an offset to reduce the government's recovery, no tax resources will be called upon to pay a judgment, and the fiscal planning of the governmental entity should not be disrupted." *Id.*

Accordingly, the policy reasons behind our decision in *Reata* support the broad language we used in that case, as well as the conclusion that *Reata*'s holding applies when the government chooses to file a **\*519** claim for "monetary relief" or "monetary recovery," not just for "damages" or "compensatory damages," as the State suggests. And here, the State is undeniably seeking monetary relief. In this circumstance, as in *Reata*, "the governmental entity has joined into the litigation process by asserting its own affirmative claims for monetary relief." *Id. at 376–77*. I therefore "see no ill befalling the governmental entity or hampering of its governmental functions" in this case by allowing the Providers to assert, as an offset, claims germane to, connected with, and properly defensive to those asserted by the State. *Id.*

Moreover, it is fundamentally unfair to allow the State to assert affirmative claims against the Providers—claims that could result in millions of dollars of recovery—but deny the Providers an opportunity to merely offset that recovery with counterclaims seeking, at a minimum, the release of money that every court to adjudicate the merits of the case has held to be unlawfully retained by the government. *See Borunda, 540 S.W.3d at 553* (citing *Reata, 197 S.W.3d at 375–76* ("[I]t would be fundamentally unfair to allow a governmental entity to assert affirmative claims against a party while claiming it had immunity as to the party's claims against it."), and *Albert, 354 S.W.3d at 380* (noting that "here we do not see any fundamental unfairness or inequity occurring") ). The State has undoubtedly taken advantage of its sovereignty, unsuccessfully pursuing its fraud claims through several tribunals, modifying findings and orders in support of its position, and then, faced with court orders to release the withheld funds, abandoning its claims only to reappear here and assert immunity. I would hold that the State's pursuit of monetary relief under the Medicaid Fraud Act subjected it to the jurisdiction of the Court for offsetting, related counterclaims. "To hold otherwise would permit [the State] to use the court in the attainment of [its] object by piecemeal, by first adopting its judgment as right, and then repudiating it as wrong, and to avail [it]self of the advantages of its being both right and wrong." *See Sec. Trust. Co. of Austin v. Lipscomb County, 180 S.W.2d 151, 158 (Tex. 1944)* (citation and internal quotation marks omitted).

### C. The Court's "Law-Enforcement" Exception

The Court ignores the policy and jurisprudential concerns discussed herein, concluding instead that "sovereignty itself remains an important justification for sovereign immunity." *Ante* at 508. But as we have already explained, protecting the public fisc and public reliance on government services, not fealty to an all-powerful sovereign, underlie our modern justifications for maintaining the doctrine. *Olivares, 461 S.W.3d at 121*. Regardless, the Court adopts the State's view that *Reata* does not apply here because the State is acting in its sovereign "law-enforcement" capacity. According to the Court, *Reata* "*never* applies when the state initiates litigation to enforce a substantive prohibition against unlawful conduct by imposing a monetary penalty." *Ante* at 507. Because "[p]enalties serve a law-enforcement function," the Court asserts, allowing "spurious counterclaims" would "severely undermine their effectiveness" and "would interfere with the state's ability to enforce its laws." *Id.* at 509. [18]

[18] The Court's reference to "spurious counterclaims" is curious, as it implies a connection between a claim's merits and the government's immunity. Whether the government is immune from suit has nothing to do with the strength or weakness of claims asserted against it.

**\*520** The Court's law-enforcement rationale is unfounded. First, the State highlights that, when it acts in a law-enforcement capacity, it necessarily is not acting as an "ordinary litigant" as *Reata* requires. But the State's argument mischaracterizes our description of the government as an "ordinary litigant" in *Reata*. We used the term in explaining that once the government "asserts affirmative claims for monetary recovery, [it] must participate in the litigation process as an ordinary litigant, save for the limitation that [it] continues to have immunity from affirmative damage claims against it for monetary relief exceeding amounts necessary to offset [its] claims." *Reata, 197 S.W.3d at 377*. We did not hold that the *Reata* rule applies *only if* the government is participating in litigation as an "ordinary litigant"; rather, we held that *when* the *Reata* rule applies the government must *participate as* an "ordinary litigant." *Id.* This is consistent with the well-recognized principle that our procedural and evidentiary rules apply to the State as they would to any other litigant when it appears in court. *See State v. Naylor, 466 S.W.3d 783, 792 (Tex. 2015)* ("[W]here the Legislature has given no indication to the contrary the State must abide by the same rules to which private litigants are beholden."). These references to the State as an "ordinary litigant" do not address the sovereign-immunity question of whether the State may be required to appear in court. Nothing in *Reata*'s text or reasoning limits its application to cases in which the State appears as an "ordinary litigant," as opposed to "enforcement actions." *See Reata, 197 S.W.3d at 376* (discussing *Kinnear v. Tex. Comm'n on Human Rights, 14 S.W.3d 299, 300 (Tex. 2000)* (holding that the State was not immune from a counterclaim for attorney's fees in an enforcement action under the Texas Fair Housing Act) ).

Second, a law-enforcement exception would swallow the *Reata* rule. The Court gives little guidance on how to determine whether the State is acting in a "law-enforcement" capacity as opposed to an "ordinary litigant," other than to state that the exception applies "when the state seeks to impose a monetary penalty to enforce a substantive prohibition against unlawful conduct" and that "action is punitive rather than compensatory." *Ante* at 510. But the Court's new rule obfuscates over a century of our sovereign immunity jurisprudence. As previously noted, our precedent before and after *Reata* unequivocally involved "substantive" claims, both statutory and under the common law, and many involved the imposition of "penalties." *See, e.g., Anderson, Clayton & Co., 62 S.W.2d at 110* ("[T]he jurisdiction of the court cannot afterwards be defeated by the state upon a plea that the cross-petitioners were seeking an injunction against the enforcement of a penal statute.").

When any governmental body brings suit, it necessarily acts under its sovereign authority to police and enforce the laws of the State. *See Reata, 197 S.W.3d at 384* (Brister, J., concurring) ("[W]hen governments bring suit, they must do so through agents who ultimately derive their authority from the Legislature .... But when they file suit on an affirmative claim, they must be doing so with legislative authorization. If the rule were otherwise, it is not clear how a government could ever assert its own claims."). The Court's decision today throws what has been a well-settled doctrine into limbo

because almost any action brought by a governmental body arguably constitutes a "law-enforcement" action. [19]

[19]　*See, e.g.,* TEX. AG. CODE §§ 17.152, .153 (providing for civil action for actual damages, treble damages, and civil penalties, or action under the DTPA for failing to post notice of fuel tax rates, or document or record those rates); TEX. BUS. & COM. CODE §§ 15.21 (providing that any "person or governmental entity" who is harmed by unfair trade practices under the Antitrust Act "shall recover" actual damages, interest, and treble damages), 17.953 (providing for the State's recovery of restitution and civil penalties for violations of the Deceptive Trade Practices Act); TEX. INS. CODE § 541.151 (providing for civil penalties for unfair competition and deceptive acts in insurance industry); TEX. OCC. CODE §§ 351.603, .604 (providing for civil penalties for violations of the Optometrists Act).

**\*521** I see no principled basis for adopting the State's position that the Medicaid Fraud Act enables it to bring a specialized law-enforcement action that justifies an exception to the *Reata* rule. By participating in the federal Medicaid program and enacting the Act and its enabling regulations, the Legislature has already established a balanced statutory scheme for protecting the public against fraud. Under federal law, a state must have a "Medicaid fraud control unit," 42 U.S.C. § 1396a(a)(42)(B)(ii)(IV)(cc), which investigates program violations and can refer matters for criminal prosecution or "to an appropriate State agency" for other action, 42 C.F.R. § 1007.11(b)(3) (2018). In Texas, such enforcement actions can take the form of criminal,[20] administrative,[21] and civil proceedings.[22] Here, if the State desired the deference and protection of its sovereignty, it could have brought (and can still bring) a criminal action against the Providers in this case, subject to, of course, the corresponding burden of proof. Likewise, the State could (and did) bring an administrative action for sanctions for the same alleged violations. The State was certainly entitled to pursue this civil action in lieu of its nonsuited administrative claims, *see Albert,* 354 S.W.3d at 375 ("Under litigation rules applicable to ordinary litigants ... the City was entitled to nonsuit its [claims]."), but "preventing all offsetting claims" by creating a law-enforcement exception here "looks less like

sovereign immunity than sovereign inequity," *Reata,* 197 S.W.3d at 383 (Brister, J., concurring).

[20]　*See* TEX. PEN. CODE § 35A.02(a)(1)–(12); *see also* TEX. HUM. RES. CODE § 32.0391 (establishing a criminal offense for kickback and bribery schemes).

[21]　*See* TEX. HUM. RES. CODE §§ 32.039 (outlining "Damages and Penalties" the State may seek in an administrative action against a provider accused of Medicaid fraud), 36.006 ("The application of a civil remedy under this chapter does not preclude the application of another common law, statutory, or regulatory remedy, except that a person may not be liable for a civil remedy under this chapter and civil damages or a penalty under Section 32.039 if the civil remedy and civil damages or penalty are assessed for the same act.").

[22]　*See id.* §§ 36.002 (defining "Unlawful Acts" relating to Medicaid fraud), .052 (establishing "civil remedies" and authorizing the State to initiate an action for civil remedies or an injunction under the Act).

### D. Connected, Germane, and Defensive Nature of Counterclaims

Finally, the Court concludes that *Reata* does not apply to the Providers' counterclaims because they are not connected, germane, and properly defensive to the State's Medicaid fraud claims. Considering the underlying allegations, the appropriate legal standard, and the State's burden on the merits, I cannot agree with this conclusion.

Where, as here, a plea to the jurisdiction challenges the pleadings, we determine if the pleader has alleged facts that affirmatively demonstrate the court's jurisdiction to hear the cause. *City of El Paso v. Heinrich,* 284 S.W.3d 366, 378 (Tex. 2009). Whether a pleader has alleged facts that affirmatively demonstrate a trial court's **\*522** subject matter jurisdiction is a question of law reviewed de novo. *Tex. Dep't of Parks & Wildlife v. Miranda,* 133 S.W.3d 217, 226

*(Tex. 2004)*. We must construe the pleadings liberally in favor of the nonmovant and look to the nonmovant's intent. 🚩*Heinrich*, 284 S.W.3d at 378.

We explained in 🚩*Albert* that counterclaims are "germane"—that is, "relevant"—to the government's claims when they are based on the same question as the government's claim, and are "properly defensive" when they "would at least inferentially rebut" the government's allegations. 🚩354 S.W.3d at 375. Here, the State claims that the Providers committed unlawful acts by submitting prior-authorization and post-treatment-payment requests and then accepting payments even though the services they provided did not qualify for reimbursement under the Medicaid program. The Providers' breach of contract and conspiracy counterclaims are based on their allegations that the State had an independent duty to determine whether the patient qualified for the services, that the State (through and in conspiracy with its contractor, Xerox) failed to fulfill that duty, and that the Providers reasonably relied on the State's decisions when providing the services. And the Providers' conversion counterclaim is based on the State's continued retention of Medicaid funds under a payment hold initiated on the same allegations, same facts, and same defendants as the State's failed administrative cases.

Unlike the Court, I conclude that the counterclaims are relevant and defensive to the State's claims. On the merits, the State must show that the Providers acted "knowingly" in undertaking the unlawful acts defined in the statute. *See* 🚩TEX. HUM. RES. CODE § 36.002. The Providers allege that the State and Xerox conspired to mislead the Providers into believing that their requests complied with the Program's requirements. As the Providers frame their complaint, "the State now seeks to recoup the payments that it made to the [Providers] after the [Providers] provided the very services the State had deemed to be medically necessary." (Footnote omitted). Thus, contrary to the Court's conclusion, the

Providers' allegations, if true, negate the State's assertion that they knew the services submitted for reimbursement were not medically necessary, which is a material element of each of the State's claims. These allegations are clearly connected and relevant to the parties' claims, and if the Providers are correct, their counterclaims will rebut the allegations on which the State's claims are based. *See* 🚩*State v. Martin*, 347 S.W.2d 809, 814 (Tex.Civ.App.—Austin 1961) ("Appellee's claim to recover the very money which the State seeks to retain, the claim of each arising from the same single transaction between the parties, could not be more closely related or more germane."). Applying the appropriate standard of review at this early stage in the proceedings, I must conclude that the Providers have met their burden of alleging facts overcoming the State's assertion of immunity.

### III. Conclusion

When we explained the limited scope of the government's immunity against counterclaims in 🚩*Reata*, we relied on the policies that justify the doctrine in the first instance. Because the 🚩*Reata* rule permits only germane and properly defensive counterclaims and permits relief only in the form of an offset against the government's monetary recovery, we concluded that it "would be fundamentally unfair to allow a governmental entity to assert affirmative claims against a party while claiming it had immunity as to the party's claims against it." 🚩197 S.W.3d at 375–76. For the reasons explained, I reach the same conclusion **\*523** here and would hold that the State is not entitled to dismissal of the Providers' counterclaims. Because the Court holds otherwise, I must respectfully express my dissent.

### All Citations

561 S.W.3d 495, 61 Tex. Sup. Ct. J. 1525

---

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Pauline Sisson on behalf of Abigail Smith
Bar No. 24141756
pauline.sisson@oag.texas.gov
Envelope ID: 99647007
Filing Code Description: Brief Requesting Oral Argument
Filing Description: 20250414 Appellates Brief with Appendix
Status as of 4/14/2025 3:53 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| David Walsh | 791874 | dwalsh@katxlaw.com | 4/14/2025 3:41:30 PM | SENT |
| Pauline Sisson | | pauline.sisson@oag.texas.gov | 4/14/2025 3:41:30 PM | SENT |
| David Phillips | | DPhillips@winston.com | 4/14/2025 3:41:30 PM | SENT |
| Emily Samuels | | emily.samuels@oag.texas.gov | 4/14/2025 3:41:30 PM | SENT |
| Melinda Pate | | melinda.pate@oag.texas.gov | 4/14/2025 3:41:30 PM | SENT |
| Jamie Vargo | | JVargo@winston.com | 4/14/2025 3:41:30 PM | SENT |
| Houston Docket | | ecf_houston@winston.com | 4/14/2025 3:41:30 PM | SENT |

Associated Case Party: Nonparty Patient No. 1

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| William Logan | 24106214 | wlogan@winston.com | 4/14/2025 3:41:30 PM | SENT |
| Evan Lewis | 24116670 | edlewis@winston.com | 4/14/2025 3:41:30 PM | SENT |
| Jervonne Newsome | 24094869 | jnewsome@winston.com | 4/14/2025 3:41:30 PM | SENT |
| Thanh Nguyen | | tdnguyen@winston.com | 4/14/2025 3:41:30 PM | SENT |
| Olivia Wogon | | owogon@winston.com | 4/14/2025 3:41:30 PM | SENT |
| Jonathan Hung | | JOHung@winston.com | 4/14/2025 3:41:30 PM | SENT |

Associated Case Party: State of Texas

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| David G. Shatto | | david.shatto@oag.texas.gov | 4/14/2025 3:41:30 PM | SENT |
| Rob Farquharson | | rob.farquharson@oag.texas.gov | 4/14/2025 3:41:30 PM | SENT |

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Pauline Sisson on behalf of Abigail Smith
Bar No. 24141756
pauline.sisson@oag.texas.gov
Envelope ID: 99647007
Filing Code Description: Brief Requesting Oral Argument
Filing Description: 20250414 Appellates Brief with Appendix
Status as of 4/14/2025 3:53 PM CST

Associated Case Party: State of Texas

| Rob Farquharson | | rob.farquharson@oag.texas.gov | 4/14/2025 3:41:30 PM | SENT |
|---|---|---|---|---|
| Johnathan Stone | | johnathan.stone@oag.texas.gov | 4/14/2025 3:41:30 PM | SENT |
| Ian Bergstrom | | Ian.Bergstrom@oag.texas.gov | 4/14/2025 3:41:30 PM | SENT |
| Abby Smith | | abby.smith@oag.texas.gov | 4/14/2025 3:41:30 PM | SENT |
| Amy Pletscher | | amy.pletscher@oag.texas.gov | 4/14/2025 3:41:30 PM | SENT |